[No. 8580. Department One. May 31, 1910.]

# S. K. BOWES et al., Appellants, v. THE CITY OF ABERDEEN et al., Respondents.[1]

EMINENT DOMAIN—"TAKING OR DAMAGING" PROPERTY—JUDICIAL QUESTION. What is, or is not, a taking or damaging of private property is a judicial question, and the courts are not bound by a legislative declaration to the effect that the filling of low lands shall not be considered a taking or damaging within the constitutional meaning of those terms.

MUNICIPAL CORPORATIONS—IMPROVEMENTS—FILLING LOW LANDS—POLICE POWER—HEALTH. A city may, by virtue of the police power, in a proper case, and when necessary to the public welfare, irrespective of the right of eminent domain, fill in low lands that are unsanitary and a menace to health, without rendering compensation for damages claimed to private property filled in; and under Rem. & Bal. Code, § 7975, may assess the property to pay the cost of the work, providing the exercise of the power is not unjust or arbitrary.

SAME—NECESSITY FOR IMPROVEMENT—EVIDENCE—SUFFICIENCY. A necessity exists, authorizing the exercise of the police power by a city for the purpose of filling low lands, and the improvement is not disproportionate to the danger, where it appears that an area covering one thousand city lots, within or adjacent to the business portion of a city where permanent streets are necessary, are so low and covered with stagnant water as to be unsanitary and a serious menace to the health of the city, and that the danger can be removed by filling in the land, and by no other practical or economical method.

SAME—DETERMINATION—JUDICIAL QUESTION. Whether the facts warrant the exercise of the police power for the purpose of filling low lands in a city is a judicial question to be resolved by the courts.

SAME—STATUTES—TITLE AND SUBJECT OF ACT. The title of the act of 1909, empowering cities "to fill low lands . . . and for that purpose to exercise the right of eminent domain for the taking or damaging of property" is sufficiently broad to authorize the filling of low land under the police power as a sanitary measure without making compensation for damages claimed to the property filled in; since the reference to the right of eminent domain applies to property taken or destroyed and not to land filled in, and the power "to fill" includes the right to exercise the police power.

[1]Reported in 109 Pac. 369.

SAME — SPECIAL ASSESSMENTS — ACCORDING TO AREA — VALIDITY. An assessment upon the property to pay for the cost of filling low lands "in proportion to the surface area", as authorized by Rem. & Bal. Code, § 7975, is not unreasonable or arbitrary, because not made according to benefits or in proportion to the value of the property; nor is the same void as authorizing unequal taxation, in violation of the constitution requiring property to be taxed according to its value, as that clause of the constitution does not apply to special assessments.

SAME—CONSTITUTIONAL LAW—DUE PROCESS—STATUTES. The act of 1909 empowering a city to fill low lands and assess the cost upon the lands filled in in proportion to the surface area, is not a deprivation of property without due process; since it provides for notice and a hearing and authorizes the board to make alterations and modifications in the assessment as justice and equity may require.

FULLERTON, J., dissents.

Appeal from a judgment of the superior court for Chehalis county, Sheeks, J., entered December 29, 1909, dismissing an action to enjoin a city from the prosecution of a public improvement, after a trial on the merits before the court without a jury. Affirmed.

J. B. Bridges, for appellants.

A. M. Wade and Theo. B. Bruener, for respondents.

CHADWICK, J.—The city of Aberdeen, a rapidly growing city of approximately twenty thousand inhabitants, is situated on the Chehalis river at or near its junction with Grays Harbor, an inlet of the sea. Bordering the stream there is a wide flat or tidal marsh, intersected by sloughs, through which the tide and flood waters and storm drainage from the hills have been accustomed to flow. At certain times of the year and upon certain tides, the water stands over the whole flat to a depth of from three to four feet, while at all times the ground water stands a few inches beneath the surface of the sloughs. The business part of the city, as well as a part of the residence district, is built upon these tide flats. The business of the city and the comfort and convenience of the

citizens demand that the grade of the streets be raised so as to bring them above .the level of the high tides. Up to this time is has been possible, as well as feasible, to make elevated plank streets or roadways and sidewalks, but the increasing price of lumber, its lack of durability, and other reasons make it necessary to improve the streets in some permanent manner. It is possible to do this in one of two ways; to grade or fill the streets and alleys up to the required level, or fill the whole district, including the lots and blocks. To accomplish the first plan would require the erection of banks or retaining walls along the street lines, with openings left thereunder for drainage. To carry out this plan would cost approximately fifty cents a cubic yard. The other plan, being the one adopted by the city council, could be accomplished by hydraulicing the mud and silt from the harbor or river channels, or dirt from the adjacent hills, and would cost approximately eighteen cents per cubic yard. The answer of the city to the petition of the appellants recites the further condition as warranting the improvement in the manner contemplated:

"That the lands within the said improvement district have become and now are an important part of the city of Aberdeen, and is fast becoming of more importance as a part of the said city; that many houses, barns, out-buildings and other structures have been built upon the private property within the said district and many other like structures are being built thereon, and many more will be built thereon; that because of the low and swampy condition of said lands and because of the inability to drain the same and because of the stagnant waters standing thereupon, and because of the many dwellings, barns, stores and other structures located upon said lands, the said lands have become and are greatly detrimental to the public health and to the public welfare of the persons residing within the said district, and the city of Aberdeen generally, and that said condition is an unsanitary one and dangerous to the public health and welfare of the citizens of the said district and of all of the citizens of the said city of Aberdeen; . . . that to fill the said streets and alleys as

aforesaid without filling the said private property would leave all of the said private property low, wet and marshy ground, and would cause the same to be more unsanitary than the same now is without said streets and alleys being filled, and would cause the water to stand upon the said private lands throughout the year, even to a greater extent than the same now stands thereupon, and would cause the same to be very unsanitary and detrimental and dangerous to the public health and welfare of the said citizens; that it is necessary, for the purposes aforesaid, to fill the said streets and alleys and to fill the private property to the grade aforesaid; and that the public health and public welfare of the said citizens of the said district and of the said city of Aberdeen require that such filling be done; that the said public health and public welfare of the said citizens required the said grades to be re-established and raised because the old grade of the said streets and alleys was too low and did not, in any manner, provide for the drainage of the said district, the said grade as formerly established being a level one throughout the said district, and that for sanitary reasons and in order to keep the water from standing upon the said streets and private property, and in order that the same might be drained, it was necessary that the said grade of the said streets and alleys be raised as described in the complaint herein; that the public health and public welfare required and requires the raising of the grade of the said streets and alleys aforesaid and the filling of the said streets and alleys as aforesaid, and the filling of the said lots as described in the petition herein."

While it is provided, in section 5 of the act of 1909, chapter 147, page 572 (Rem. & Bal. Code, § 7975), under which the city is probably proceeding, that the filling of unimproved and uncultivated low lands of the character described in the answer and in the ordinance declaring the intention of the city shall not be considered a taking or damaging within the constitutional meaning of these terms, the city in its answer disclaims any intention or purpose to condemn the right to fill the lots and blocks belonging to private owners. We are of the opinion that the constitutional question thus raised may be safely disregarded, for if the city can fill the property

of a private owner under the act of 1909 or the act of 1907, Laws 1907, §§ 53-56, page 657 (Rem. & Bal. Code, §§ 7636-7639), in the manner contemplated, it must be done under the exercise of its police power, and not because the legislature has undertaken to say what shall be, or rather what shall not be, a taking or damaging of property. This is a judicial question, and were we inclined to pursue it further, we would not, as at present advised, feel bound by the declaration of the legislature. The regularity of all antecedent proceedings on the part of the council is not challenged by plaintiffs, so that the case is squarely before the court upon the question whether, under the facts as we have outlined them, a city can, in the exercise of its police power, fill the property of a protesting landowner so as to make a present condition sanitary, or anticipate a condition which is reasonably certain to follow the ordinary growth of a thrifty city.

While the evidence is conflicting, in the sense that a witness testified that present conditions were not unsanitary, the weight of the evidence is overwhelmingly in favor of the city's contention. Mr. Benn, the mayor, who has been a resident of the city since the first house was erected, says the conditions are unsanitary, and attributes present and possible conditions to the natural growth of the city and the stoppage of the natural ditches and drains, resulting from ordinary use. The health officer of the city testifies that there has been a greater mortality, especially among children living upon or over the tidal marshes, than upon the hill districts, and attributes the fact to the pollution of the soil consequent upon human habitation without proper drainage. Mr. Ewart, the city engineer, whose description of the physical conditions is accepted by the petitioners, and whom we therefore conclude to be skilled in his profession, says:

"Q. What effect does the levelness of this land have upon the drainage and sewerage? A. To put a sewer system on the level of this ground is impracticable. They are too flat.

The sewer pipe would have to be laid on a gradual slope of the river, and it would make them above the level of the lots in the district proposed to be filled. Q. In the proposed fill, Mr. Ewart, are these lands to be leveled more on the back side? A. They will have an incline of six inches to the block from the hill to the river; that is the least practical fall you can make on the streets. . . . Q. Do you consider, Mr. Ewart, you have heard the testimony as to the sanitary conditions in this district, do you consider that the land within this district or that this district as it stands is unsanitary? A. Very. Q. Will you give your reasons why? A. The presence of human beings tends to make it unsanitary. The offal from the table, from the animal excrement, is bound to accumulate more or less in this soggy ground, and makes it unsanitary. Q. Your idea then would be that the more people live in that district, the more unsanitary it would be? A. Yes, sir. Q. Do you consider this property was unsanitary in its original condition? A. It was by itself. Of course, if there was nobody there, no one would be likely to get sick. Q. To make as favorable illustration as you can, suppose there was no one living but one man in that district? A. Outside the dampness it would not be unsanitary. Q. Would the dampness be unsanitary? A. It is, yes. A great many people suffer from cold and on account of dampness. Q. You have never known of any plague or great amount of sickness on account of this condition, have you, in the city of Aberdeen or Hoquiam and that neighborhood? A. Yes. Q. You think that there is more sickness from the people living on the more level ground than on the high ground or hill district? A. This particular place has not been settled thick enough to cause that condition yet, but where it is more thickly settled, it is, yes. Q. Then your idea boiled down amounts to this, that in its original condition, when the tide came and went, and the sloughs were not interfered with, it was simply unsanitary, but that it would become more unsanitary as the district became more populated? A. Yes, sir. Q. And that it would become more unsanitary than it is now? A. Yes, sir. . . . Q. I want to get at your idea as to the necessity of filling this property, because of sanitary conditions; as I understand you, you think it is necessary? A. I do. If you confine a few people in that district, and dike the district, and you allow no more people to go in there, and keep them absolutely clean, make them

keep their houses clean and their sewerage and garbage out
of the way, you might have a sanitary district; but it is
not practicable to do that. For instance, the district imme-
diately west of this it is planned to dike, and the people
living there are widely separated, and for the present that
would answer, but if heavily populated, it would not be
practicable or sanitary. Q. Is there not some way of mak-
ing this land sanitary without so much expense and without
filling it? A. I do not think so. You could make it more
nearly sanitary by diking it, but we have the tide water from
the river; and whenever you dam that out you also dam in the
storm water, and all your water will be dammed in at the same
time that your tide water is dammed out."

Plaintiffs asked for an order restraining the city from
further prosecuting its design. After a trial upon the merits,
the complaint was dismissed, and the plaintiffs have appealed.

But one assignment of error it made; that is, that the
court erred in dismissing plaintiffs' complaint with prejudice.
This is argued under two subdivisions, (1) that the ordinance
is void, inasmuch as it takes and damages appellants' prop-
erty without due process of law; (2) because the ordinance,
as shown upon its face and by the testimony, is unreasonable
and arbitrary. It is admitted that "the property owner
has not an absolute control over his property, but that he
holds it subject to the rights of the community at large,
and that it is one of the conditions of his tenure that he hold
or use his property so as not to injure others." But it is
said that "the police power, except in cases of extreme emer-
gencies or of imminent danger, cannot take from the prop-
erty owner his property without paying full compensation
therefor and without proving a public necessity for such tak-
ing." Just what the police power of a state or city may be
is, as all of the authorities agree, or, at least, those following
the *Slaughter-House Cases*, 83 U. S. 36, incapable of exact
definition or limitation; for, as was most pertinently said in
*Stone v. Mississippi*, 101 U. S. 814, "it is always easier to de-
termine whether a particular case comes within the general

scope of the power, than to give an abstract definition of the power itself which will be in all respects accurate."

Incapability of definition, however, does not destroy the right of the public to safeguard property, insure the general health, protect the morals, preserve the peace, or compel the use of property consistent with surrounding conditions by the exercise of arbitrary power and in disregard of the primary right of the individual. A subject when measured by other conditions may warrant its exercise; whereas, if the relative condition be lacking, the power will be denied. Its exercise in proper cases marks the growth and development of the law rather than, as some assert, a tyrannical assertion of governmental powers denied by our written constitutions. Although the fundamental truths must from their very nature remain unchanged, the right of property is a legal right and not a natural right, and it must be measured always by reference to the rights of others and of the public. Neither an individual nor the public has the right to take the property of another and put it to a private use. But it would be manifestly destructive to the advancement or development of organized communities to put the public to the burden of rendering compensation to one, or to many, when the individual use is, or might be, a menace to the health, morals, or peace of the whole community. These are the principal grounds upon which the right to exercise the police power rests, and the only question confronting us is whether the present attempt comes within these recognized principles. Freund, in his work on Police Power, § 143, says:

"The questions which present themselves in the examination of a safety or health measure are: does a danger exist? is it of sufficient magnitude? does it concern the public? does the proposed measure tend to remove it? is the restraint or requirement in proportion to the danger? it is possible to secure the object sought without impairing essential rights and principles? does the choice of a particular measure show that some other interest than safety or health was the actual motive of the legislature?"

The first test proposed—does the danger exist—may be almost summarily disposed of. Although we are not prepared to indorse the rule, asserted by some case writers, that a court will be bound by a legislative direction to that effect, we are not put to a consideration of that question in this case. The evidence, as we have shown, abundantly sustains the declaration of the city council that the land proposed to be filled is unsanitary, and is or may become a menace to the public health. That it is of sufficient magnitude and concerns the whole public in so far as the municipality is concerned, is likewise shown. The area to be filled covers approximately one thousand city lots, with adjoining streets and alleys. These are located partly within and partly adjoining the business portion of the city, where permanent streets are necessary and where undrained land would jeopardize health and retard the growth of the city. So, too, the proposed improvement will remove the danger, leaving the area affected above the higher waters at flood tides or storm periods, and insure perfect drainage as well as an entire absence of stagnant water. The proposed improvement is not disproportionate to the danger, for it is shown that, if the danger is removed at all, it cannot be done in any other practical or economical way.

The remaining tests require more extended argument, and may be discussed together. They are covered by the appellants' objection that the exercise of the power asserted in this case is unjust and arbitrary. Appellants base their contentions primarily upon the statement in Lewis on Eminent Domain (2d ed.), vol. 1, page 473:

"The police power, so far as it relates to property, is a power to regulate its use, and is negative or inhibitory in its character. A man cannot be compelled, under the police power, to devote his property to any particular use, however advantageous to himself or beneficial to the public; but he may be compelled to refrain from any use which is detrimental to the public. This is the beginning and the end of the police power over private property. No instance can be cited, out-

side of the mill and drainage acts (which are in controversy),
in which the owner of private property has been compelled to
devote it, or submit to its devotion, to a particular use, by
virtue of the police power, or of any other power except that
of eminent domain."

The true rule is also found in 10 Am. & Eng. Ency. Law
(2d ed.), page 223:

"To effect the drainage of large tracts of land and thereby
make them fit for habitation and use is a purpose sufficiently
public to justify the exercise of the right of eminent domain."

To say that the police power can only be exercised in given
cases, and then call a halt, would be to fix a limitation which,
from the very nature of the power itself, cannot be done.

It is asserted, however, that, if the case falls within the
drainage cases, this court has expressly held that the right
to proceed thereunder cannot be sustained by reference to the
police power, but must be carried out under the law of eminent
domain, and the following decisions of this court are cited and
relied upon: *Askam v. King County*, 9 Wash. 1, 36 Pac.
1097; *Skagit County v. Stiles*, 10 Wash. 388, 39 Pac. 116;
*Snohomish County v. Hayward*, 11 Wash. 429, 39 Pac. 652.
The *Askam* case was properly decided. In that case suit
was prosecuted by one over whose land it was proposed to
run a ditch for the purpose of draining the lands of others.
He was not in fault, nor was he using his property to the det-
riment of the public. As was said by the writer of the opin-
ion:

"Even if we concede that the requirements of the law are
such that the board of county commissioners must decide that
the swamps to be drained are a nuisance, before they will
proceed in the matter, yet the intention does not appear in the
act to declare the nuisance to be of such imminent danger to
the public welfare as to require private property of others
than those maintaining the nuisance to be taken without com-
pensation."

While the other cases relied upon affirm correct principles
of the law, they were, in the opinion of the writer, considering

the facts of each particular case, improperly decided. At any rate, in the light of subsequent decisions of this court, they should not be considered authority in this case. The difference between one whose land is taken or damaged in the aid of a public improvement and one whose land is actually improved was noticed in *Lewis County v. Gordon,* 20 Wash. 80, 54 Pac. 779. In *Wurts v. Hoagland,* 114 U. S. 606, the reasoning of Chancellor Zabriskie, in *Coster v. Tide Water Co.* (18 N. J. Eq. 54, 68), is adopted as a correct statement of the law:

"The principle of them all is, to make an improvement common to all concerned, at the common expense of all. And to effect this object, the acts provide that the works to effect the drainage may be located on any part of the lands drained, paying the owner of the land thus occupied compensation for the damage by such use. So far private property is taken by them, farther it is not. In none of them is the owner divested of his fee, and in most there is no corporation in which it could be vested, and for all other purposes the title of the land remained in the owner. To effect such common drainage, power was in some cases given to continue these drains through adjacent lands not drained, upon compensation. All this was an ancient and well-known exercise of legislative power, and may well be considered as included in the grant of legislative power in the constitution."

That the legislature has the right to assert its police power in this regard cannot now be questioned. Cooley, Constitutional Limitations (7th ed.), page 868; Cooley, Taxation (2d ed.), 617; *Fallbrook Irr. Dist. v. Bradley,* 164 U. S. 112; *Hagar v. Reclamation District,* 111 U. S. 701; *Head v. Amoskeag Mfg. Co.,* 113 U. S. 9. It would unnecessarily and unreasonably extend the limit of this opinion to notice the long line of cases where the state courts have construed this power. But whether the facts of the particular case warrant the assertion of the power is a judicial question, to be resolved by the courts. Freund, Police Power, § 142.

"It is sometimes difficult to draw a precise line of distinc-

tion between the public and private objects of improvements of the nature under consideration here. It is true, the owner of land may use it and cultivate it as he desires, so long as he does not injuriously affect the rights of others. But the public also has an interest beyond that of the mere sanitary condition of the land, and founded upon other and different principles than the controlling or abatement of nuisances, where any considerable number of persons are concerned, or tract of land is useless, and improvements may be made commensurate to the benefits received, and the land itself may be taxed for said benefits. The principle requires careful application, but many illustrations of its existence can be found sustained by the highest authority." *Lewis County v. Gordon, supra,* page 90.

It will thus be seen that the conflict of authority upon the right to exercise the police power or to proceed by eminent domain is apparent rather than real. Both rules exist, but their application, as Judge Reavis has said in the *Lewis County* case, requires careful application, and must be made to depend in every case upon the subject of the particular action when measured by the public interest. Resting upon the principle that it is the duty of a landowner to so keep his property that no menace to the public health shall come therefrom, courts have held that a city could, under its police power, fill up low lying lands and recover the cost thereof. *Charleston v. Werner,* 38 S. C. 488, 17 S. E. 33, 37 Am. St. 776; *Rochester v. Simpson,* 134 N. Y. 414, 31 N. E. 871; *Nickerson v. Boston,* 131 Mass. 306.

It is also urged that the title of the act of 1909—"An act empowering cities of the second and third class to fill low lands within their borders and for that purpose to exercise the right of eminent domain for the taking and damaging of property and providing a method for making compensation therefor and providing for levying and collection of special assessments on the property benefited and declaring an emergency"—is insufficient to warrant an exercise of the police power. Although the city probably has the right to exercise its police power in all proper cases as an incident to

its general governmental powers, or under the general welfare clause of its charter, we .nevertheless believe the title to be sufficient. The employment of the words "to exercise the right of eminent domain" can be held to apply only to such property or improvements as may be actually taken or destroyed, and not to the filling of the land itself, which is in no sense taken, but is left to the free use of the owner. Section 3 of the act makes this plain. The purpose need not be expressed in words; the power to fill is sufficiently broad to include any reason recognized by the law for the exercise of the power. It was said in *In re Morgan.* 26 Colo. 415, 58 Pac. 1071, 77 Am. St. 269, 47 L. R. A. 52, with some hesitation, though why is not made clear to us, that:

"When it is clearly perceived from the terms of an act that the thing prohibited necessarily affects the public health, it may not be necessary expressly to declare therein what the object of the act is; . . ."

If the title advises the citizen that the subject of the act is to fill low lands, and gives notice of a procedure, it is enough, and will be sustained so long as the right can be rested on any recognized principle, although the "purposes" be not stated in terms. *Lien v. Board of Comr's of Norman County*, 80 Minn. 58, 82 N. W. 1094.

Finally, it is urged that the plan of assessment—that is that "the several parcels of land located in the improvement district to be assessed for such improvement shall be assessed according to and in proportion to the surface area, one square foot of surface to be the unit of assessment" (Laws 1909, page 572, § 5; Rem. & Bal. Code, § 7975), would deprive the owner of his property without due process of law. It is said that it would be manifestly unreasonable and arbitrary to assess the property of one who may have a lot worth only $750 the same amount as one whose lot is worth $5,000, or one whose lot is filled only three feet deep the same as one whose lot is filled five or six feet. No system of

taxation or assessment is fair and equal in the abstract. We can only approximate equality. The right to assess the cost of improvements by area in this class of cases has been sustained by the highest authority. *Parsons v. District of Columbia*, 170 U. S. 45; *Bauman v. Ross*, 167 U. S. 548; *French v. Barber Asphalt Co.*, 181 U. S. 324. The right to assess by area has been most frequently upheld in the drainage and levee cases coming out of the southern states, although it is affirmed in most all of the states, the courts holding that the provision of the constitution which requires all property to be taxed according to its value is applicable only to taxation in its ordinary and received sense, and not to local assessments where money is raised to be expended on the property taxed. In *Egyptian Levee Co. v. Hardin*, 27 Mo. 495, 72 Am. Dec. 276, a tax not exceeding fifty cents per acre was upheld. The court said:

"The present case may be taken as an illustration, and will show the folly of judicial interference. The charter of the Levee Company requires the tax to be regulated by the number of acres and not their value. This, upon first impressions, might carry an appearance of injustice; but it is not very easy, from all the facts disclosed in the record of this case, to infer that any practical injustice whatever has been done. Lands in the neighborhood of Alexandria are rated at seventy-five dollars an acre, and, for aught that appears, were so rated before the company was organized. The lands of the complainants are only estimated at twenty dollars per acre. . If the improvement increases the value of each class of lands *pari passu*, there is no injustice. If the levee or embankment and canals raise the price of Alexandria lands to seventy-five dollars per acre, and increase the value of the complainant's land, distant perhaps fifteen miles from Alexandria, to twenty-five dollars an acre, where is the hardship complained of? Where lands were unequal in value before the proposed adventure or improvement, it was surely not the purpose of the company to bring these lands to an equality of valuation. It was not contemplated that land worth twenty dollars an acre should be brought up to a hundred, at the same time that land worth previously seventy-five dollars an acre should be raised to one hundred

dollars per acre. This difference in value, if it arose from causes entirely independent of the overflow or its prevention, must of course still continue after the completion of the works. Neither party has a right to complain if the increase of value in each has been in the same proportion to the original value in both cases. Indeed it is quite apparent that a taxation upon value and not quantity would in the hypothesis stated produce great inequality. The burden would not be distributed in proportion to the benefit. How this may be in point of fact, we of course do not pretend to know; but there is nothing in the record to show that the facts may not be exactly as we have supposed."

To the same effect is *Austin v. Seattle*, 2 Wash. 667, 27 Pac. 557. The cases will be found in Cooley, Const. Lim. (7th ed.), p. 735; 25 Cyc. 201, and 25 Am. & Eng. Ency. Law (2d ed.), p. 1201.

Nor do we believe that appellants are in any way deprived of their property without due process of law, within the rule of *Davidson v. New Orleans*, 96 U. S. 97, and *Hagar v. Reclamation District*, 111 U. S. 701. If it be conceded that the legislative department has not the right to arbitrarily fix the amount of the tax, the act of 1909 is within that line of cases holding that, if the citizen be given an opportunity to be heard, either before the assessing body or in the courts, then the levy of such special assessments will not operate as a deprivation of rights of property without due process of law. The act in question provides for a hearing upon the assessments levied, and that at such time the board may hear, consider and determine objections and protests, and make "such alterations and modifications in the assessment roll as justice and equity may require."

It may be understood that we have not overlooked the point made by appellants that, but for an embankment made by a railroad operated along the water front under a franchise granted by the city council, the present improvement would not be necessary. There is evidence tending to show that the railroad grade is not responsible for present conditions; but, whether it is so or not, its removal would operate

to restore original conditions which are shown to be equally inconsistent with the present necessities of the public.

The judgment of the lower court is affirmed.

RUDKIN, C. J., GOSE, and MORRIS, JJ., concur.

FULLERTON, J. (dissenting)—The legislature of the state of Washington, at its 1909 session, passed an act relating to filling lands by cities of the second and third classes. Laws 1909, p. 569, ch. 147 (Rem. & Bal. Code, § 7971 *et seq.*). Section 1 of the act provides that whenever the city council of any such city shall deem it necessary or expedient on account of the public health, sanitation, the general welfare, or other cause, to fill or raise the grades or elevation of any marsh lands, swamp lands, tide lands, or lands commonly known as tide flats, or any other low lands situated within the limits of such city, and to clear and prepare said lands for such filling, such city council shall have power to do so, and to tax the cost thereof to the property benefited. Section 3 provides that, "The filling of unimproved and uncultivated low lands of the character mentioned in section 1 of this act, shall not be considered as damaging or taking of such lands." Section 4 provides for preparing plans and specifications of the improvement and for an estimate of the cost and expense thereof, in which shall be included "the cost of supervision and engineering, abstracter's fees, interest, and discounts and all other expenses incidental to said improvement." Section 5 provides for the making of an assessment roll, and further provides that the "entire amount of compensation . . . including all of the costs and expenses incidental to the condemnation proceedings, . . . with the entire cost and expense of making the improvement, may be assessed against the property within the district subject to assessment," and that "the several parcels of land located within said improvement district to be assessed for such improvement shall be assessed according to, and in proportion to, surface area, one square foot of sur-

face to be the unit of assessment." Further sections provide
for condemning the improvements upon such property, and
others relate to the procedure, the act containing elaborate
provisions for carrying into effect the declared purposes.

Within the corporated limits of the city of Aberdeen and
lying immediately west of its principal business section, is
a large area of level land that was formerly marsh land, so
situated that it is subject to the ebb and flow of the tide.
In its natural state it was penetrated by sloughs, which ad-
mitted the tides and served as drains for seepage and sur-
face waters. The surface of the land, while above the normal,
was below the extreme tides, and would be covered entirely
with water when these occurred. This caused no ill effects
to the public health, however, as the drainage was complete
and effectual. But with the advent of population came high-
ways and railroads. These were constructed down the bank
of the river across the mouths of the sloughs, partially dam-
ming them up, and while they have a tendency to cut off
the inflow of the tides, they also cut off the outflow of the
seepage and surface waters, thus causing the waters to
accumulate in stagnant pools, menacing the health of the
community. The tract in question is of considerable area,
being triangular in shape, having a base of some 4,000 feet
with an altitude of perhaps 3,200 feet. It was long since
platted into lots, blocks, streets, and alleys as a part of the
city of Aberdeen. The streets have been dedicated to public
use, and the city early established grade lines over them.
The lots number about one thousand, and are divided among
a number of owners who hold in severalty; they range in
value from $750 to $5,000, owing to location. A few busi-
ness houses and a number of dwellings with their accompany-
ing outhouses have been erected on lots within the district,
but in the main they remain unimproved.

In the early summer of 1908, the city council conceived
the idea of improving the above described district. To that
end, on June 23, 1909, it passed an ordinance establishing

new grades over the entire tract, making them higher than the earlier established grades. On September 15, 1909, it adopted a resolution declaring it to be the intention of the city council to "clear, grub and fill up to the established grade . . . all of the lots, lands and parcels of lands, . . . and all of the streets, alleys and public places, on that portion of the townsite," of the city of Aberdeen above described, reciting that it appeared to the city council that it was to the best interests of public health, sanitation and general welfare of the inhabitants of the city of Aberdeen so to do; reciting further than it was necessary to condemn certain private property in order to make the improvement, but that the cost thereof, including the costs of making the improvement with incidental costs, would not exceed $330,000. On November 17, 1909, the city council passed an ordinance directing the improvement to be made. In the ordinance it directed the city attorney to bring all necessary suits to ascertain the amount of damages to be awarded for property taken or damaged by reason of making the improvement; it directed that the total cost and expense of making the improvement, "including the cost of making compensation for property taken or damaged, and including the cost of supervision, engineering, abstract fees, interest and discounts, and all other expenses incidental thereto, not exceeding the estimated cost, three hundred and thirty thousand dollars ($330,000) . . . be taxed and assessed against all of the lots, lands and parcels of land included in such tract, and that the several parcels of land . . . be assessed according to and in proportion to surface area, one square foot of surface to be the unit of assessment." Immediate payment for the work is provided for by the issuance of bonds, which in turn will be taken up when the assessments are paid. After the passage of the ordinance, the city brought condemnation proceedings against certain property holders who had improvements on their lots which it was conceived would be damaged by the fill, but no pro-

ceedings were instituted against persons owning unimproved lots in the district. This action was thereupon begun by the appellant to enjoin the prosecution of the work. In his complaint he alleged that he was the owner of unimproved property in the district sought to be improved; that his property would be greatly and irreparably injured and damaged by the proposed fill, and that such damages had not been first ascertained and paid to him. He then alleged that the ordinance, and the laws under which the ordinance was passed, were unconstitutional and void for various reasons, among which were that it sought to take his property without compensation and without due process of law.

To the complaint the city answered, expressly admitting that the complainant's property would be irreparably injured by the fill, but alleged that the tract sought to be filled was fast becoming unsanitary and a menace to the public health, and that the necessity for the work was imperative because of this fact; further answering, the defendants alleged that it is not the "intention of the city of Aberdeen to at any time condemn or appropriate the right to raise the said grade and fill the said streets and the said private property as aforesaid; that because of the matters and things hereinbefore set out the condition of the district is such that the city of Aberdeen has a lawful right to raise the said grade and fill said streets, alleys and private property without the payment at any time of any damage, . . . and that the city intends to and will make such fill in the manner set out herein, and in the complaint"; that is, at the cost of the private property therein according to area, without reference to benefits or injuries, or any consideration of relative values.

On the issues made a trial was had in which evidence was introduced on the part of the city tending to show that the tract in question was unsanitary, and that it was necessary to make the fill proposed to render it healthful, and, indeed, it may be conceded that such was the distinct weight of the

evidence. The trial judge concluded therefrom that the plaintiff was without cause of complaint, and entered a judgment dismissing his action with prejudice to his right to further litigate the questions involved. This is the judgment from which the present appeal is taken, and the judgment this court affirms in the foregoing opinion.

The judgment is affirmed on the ground, as I understand it, that the acts of the city, both committed and contemplated, are but a legitimate exercise of its police powers, and therefore invade no lawful right of the appellant. With this doctrine I am unable to agree. I have no doubt that when the owner of private real property suffers it to become a menace to the public health, either through the accumulation of stagnant water thereon or other causes, the municipality can, under its police powers, interfere and correct the evil even to the extent of destroying the property if the necessities of the case require it to go to that extent; and that it can, furthermore, if the nuisance is one created by the property owner, abate it at his expense. But this, as I understand the rule, is the beginning and the end of the police power over private property. The state cannot lawfully, under the guise of abating a nuisance, compel an owner to make his property conform to some previously conceived scheme of public improvement; it cannot compel him at his own expense, or at the expense of his property, to abate a nuisance on his own land created by another than himself; nor can it compel him to abate a nuisance in the public streets, or subject his property to the expense of abating it, beyond the benefit the removal of the nuisance confers upon it.

All these principles have been violated in the case before us. Nowhere is it pretended that it is necessary, for the purpose merely of abating the nuisance existing upon the appellant's property, to raise it up to the grade the city has adopted as its scheme of street improvement. No doubt that it will conduce to the public welfare to grade the street

to that extent, but it is clear that this goes far beyond the necessities of the case, if abatement of the nuisance is the ultimate purpose.  Not only did the city raise the grades of the streets above those formerly existing, but the very resolution by which the proceedings were initiated calls it an "improvement," and to carry out the work it is proposed to "clear and grub" the lots preparatory to filling them—a proceeding wholly unnecessary if the mere abatement of a nuisance is the purpose of the city.  That the city in the abatement of a nuisance is limited in its procedure to the removal of the cause of the nuisance is maintained by all authority.  In 29 Cyc. 1218, the rule is stated as follows:

"A public nuisance may be summarily abated by the public authorities, but this power must be reasonably exercised, without doing unnecessary damage or injury to property, and is limited to a removal of that in which the nuisance consists."

So in *Eckhardt v. Buffalo*, 19 App. Div. 1, 46 N. Y. Supp. 204, it was held that the officers of the municipality exceeded their authority and rendered themselves personally liable, where, under the guise of abating a nuisance, they caused a new structure to be erected at great expense to the owner when the result sought to be accomplished could have been obtained by repairing and cleansing the old structure at a very moderate cost.  In the course of the opinion this language was used:

"In *Matter of Jacobs* (98 N. Y. 98) it was held that while the legislature may determine that laws are required to protect and secure the public health, comfort and safety, it may not, under the guise of police regulations, arbitrarily infringe upon personal or property rights; and its determination as to what is a proper exercise of the power is not final or conclusive, but is subject to the scrutiny of the courts.  With more persuasive force it may be said that no sanitary board or officer can be permitted, under the guise of a power to abate nuisances detrimental to health, not only to remove or abate the nuisance in so far as the public health and welfare may be endangered by its existence, but

also to proceed in a summary manner and cause new erections to be made and new appliances, contrivances and conveniences to be used and adopted, at a large expense to the owner, and far beyond what the exigencies of the particular case may require."

That an owner of land cannot be compelled to abate, at his own expense, a nuisance thereon caused by the municipality itself, or by some third person without the owner's connivance or consent, is also in accord with the great weight of authority. In the case of *Hannibal v. Richards,* 82 Mo. 330, the city constructed an embankment in the street in front of defendant's lots, which occasioned the water to accumulate on them and injuriously affect the health of the city. The defendant having refused to comply with an ordinance requiring him to fill the lots, the work was done by the city, and it brought an action to recover the cost and expense thereof. The court say:

"Now, we are asked to hold, also, that the city may create a nuisance upon the lot of an individual and then have it abated at his expense, if he refuse to do it when ordered. As well at once declare that no one can acquire any rights to town or city lots which the municipal corporation is bound to respect. The city cannot create a nuisance upon the property of a citizen and compel him to abate it. *Weeks v. City of Milwaukee,* 10 Wis. 269. The cost of filling the lots was the extent of defendant's liability, if any existed, and we see no reason why defendant should not have been permitted to show that it was less than plaintiff claimed. There is no law declaring municipal corporations infallible or that their demands are incontestible. The charter authorizing the city to fill a lot, on default made by the owner, gives her a demand against him for the cost of filling it, if done by the city, and the averment of the amount and cost of the work is one upon which an issue may be made. At a trifling expense at the time plaintiff passed the ordinance requiring these lots to be filled the pond could have been drained and but for the neglect of the plaintiff to make such drain the nuisance complained of would never have existed."

In *Weeks v. Milwaukee,* 10 Wis.* 242, 269, the defendant

city graded an alley adjoining, and made a fill in the street in front of plaintiff's lots, causing the water to flow and remain stagnant thereon, and a special tax of $498.75 was levied upon the lots by the city, $111.25 of which was to pay for the grading, and $387.50 for abating the nuisance created by the city as aforesaid. Plaintiff instituted an action to restrain the collection of the special assessment, and the trial court held the nuisance tax illegal. This view was sustained by the supreme court on a review of the case, Paine, J., delivering the opinion of the court, saying:

"I am also of the opinion that the tax assessed against the plaintiff's lots to abate a nuisance, which, it appears, was created entirely by the act of the city, in so constructing a street as to cause the water to flow and remain upon the lots, which it would not otherwise have done, is illegal. I cannot recognize the right of a corporation to create a nuisance on the lot of an individual. But to create the nuisance, and then tax him to abate it, is a double wrong. I shall not attempt any examination of the question upon authority, but I am satisfied such a right cannot be sustained. I think this conclusion results from the reasoning of Mr. Justice Smith in *Goodall v. Milwaukee*, 5 Wis. 32, which I fully approve. And until I am prepared to say that private rights must yield, even to the extent of total destruction, rather than place any impediment in the way of whatever proceedings corporations may see fit to take, I cannot say that a city may create a nuisance on the lot of a citizen without making him any compensation for the damage, and then tax him to abate it."

In *Lasbury v. McCague*, 56 Neb. 220, 76 Pac. 862, it appeared that the city of Omaha in grading a street dammed the outlet of a stream, preventing the water from escaping, and causing it to back up on land owned by one Baer, where it stagnated and became a nuisance. The city passed an ordinance directing the lot to be filled with earth, and levied the cost thereof on the lot. In a suit to declare invalid the assessment the court said:

"It requires no argument to show that whatever nuisance existed on the lot in dispute by the reason of the accumula-

tion of stagnant water was directly chargeable to the city of Omaha. The foregoing quotation from the written stipulation of facts makes it perfectly plain that the nuisance abated by the city was created by its agents. This being so, to permit the city to assess the costs 'and expenses of abating the nuisance it created against plaintiff's lot would, indeed, be a reproach upon the law. If this special tax can be upheld in an equitable proceeding, then, by a parity of reasoning, one who creates a nuisance upon the land of his neighbor may have it abated at the expense of the latter and a court of equity could not afford relief. The mere statement of the proposition shows its absurdity."

That the nuisance sought to be abated in the present case was not caused by the appellant cannot be gainsaid. As long as the tides of the sea were permitted to ebb and flow over it, as they were wont to do in a state of nature, the land was wholesome. It became to the contrary only when the embankments by the railroads and by the public for highways were constructed which cut off this flow. These were not of the appellant's construction, and to charge him with the abatement of a nuisance caused thereby violates every principle of justice.

I have found no adjudicated case where a municipality has attempted, under its police powers, to abate a nuisance in the public streets at the expense of the abutting and adjoining property, where the owners of the property were not the creators of the nuisance. Heretofore it has been supposed that this required the exercise of the powers of eminent domain, proceedings in which the property holder had a right to be heard on the question of the cost of the proceeding and the amount it was proposed to tax against his property. In this proceeding the appellant has been denied this right. He at no time had, or has had, an opportunity to question either the necessity of the work, the amount it is proposed to pay for it, or the proportionate share thereof it is proposed to assess upon his property. This is taking his property for a public use without compensation and without due process of law. But this particular case has peculiar hardships. It

will be remembered that the appellant alleged in his complaint that his property would be irreparably damaged by the fill the city proposed to make, and that this allegation was expressly admitted in the answer of the city; not by mere silence or failure to deny the allegation, but in express words. It will be remembered also that certain lots in the district have buildings upon them recognized as improvements and which the city has condemned and paid for; that the lots sought to be filled are unequal in value, and unequal in respect that some of them require more material to fill them than will be required to fill the appellant's lot, and also that some of the lots will be materially benefited by the fill, yet it is proposed to pay the cost of the work by an assessment upon the lots within the district according to area. In other words, the appellant's lot, which is irreparably damaged by the fill, is taxed to pay not only for the fill itself, but to pay damages assessed to other lots which may be materially benefited by the fill. Aside from the fact that this seems directly contrary to the first section of the act under which the city is proceeding, I can find no authority that justifies it, even where the principle is seemingly favored by the legislature.

The drainage cases are cited by the majority as maintaining this doctrine, but I cannot think them in point. None of them lay down the rule that property in the district proposed to be drained can be taxed indiscriminately to pay the cost of the work regardless of the question of the originator of the nuisance, or whether the property proposed to be assessed is benefited or damaged by the work. On the contrary, the assessment is sustained on one or both of two theories, either that the owner of the land was responsible for the nuisance and under obligations to remove it, or its removal distinctly benefited his property. I have referred to some of the cases where the first question was involved, examples of the second can be found in the main opinion. Take for instance the case of *Hagar v. Reclamation District*,

111 U. S. 701. There the tax was upheld on the express ground that it was levied on property benefited, as witness the following extract from the opinion of the court:

"In some states the reclamation is made by building levees on the banks of streams which are subject to overflow; in other states by ditches to carry off the surplus water. Levees or embankments are necessary to protect lands on the lower Mississippi against annual inundations. The expense of such works may be charged against parties specially benefited, and be made a lien upon their property. All that is required in such cases is that the charges shall be apportioned in some just and reasonable mode, according to the benefit received."

To the same effect is *Fallbrook Irr. Dist. v. Bradley*, 164 U. S. 112. And so Cooley in his work on taxation, at the place cited by the majority, says that the "special benefits from the enhancement of values must accrue mainly to the owners of the lands drained, who ought therefore to bear the expense," clearly indicating that the basis of the right to assess in such cases was the fact that the work conferred a benefit. But it is needless to pursue the inquiry. As I say, I can find no case where private property damaged by a fill is taxed not only to make the fill causing the damage, but to fill other property both public and private, some of which is actually benefited by the fill.

I regret also that the majority have seen fit to declare that a front foot or area assessment, whether in proportion to or in excess of benefits conferred on the property by the improvement, violates no constitutional inhibition. In *Austin v. Seattle*, 2 Wash. 667, 27 Pac. 557, it was held, it is true, that such an assessment did not violate the provisions of the constitution relating to equality and uniformity in taxation, but the principle of that case, as I understand it, has been repudiated by a long line of cases decided by us since that time. In *McNamee v. Tacoma*, 24 Wash. 591, 64 Pac. 791, an assessment for a street improvement was attacked on the ground that it was made on a front foot

basis and not in accordance with benefits. In its opinion the court conceded that the true rule was that an "assessment must be tested by benefits, and that the exaction from the owner of private property of the cost of a public improvement in substantial excess of the special benefits accruing to him is, to the extent of such excess, a taking, under the guise of taxation, of private property for public use without compensation"; holding, however, that the statute under which the assessment was made did require an assessment according to benefits, and not a front foot assessment. To the same effect are the following cases: *Annie Wright Seminary v. Tacoma*, 23 Wash. 109, 62 Pac. 444; *Alexander v. Tacoma*, 35 Wash. 366, 77 Pac. 686; *New Whatcom v. Bellingham Bay Imp. Co.*, 16 Wash. 131, 47 Pac. 236.

This, to my mind, is the only rule that can logically stand the constitutional test; for any rule that taxes property in excess of benefits that is not applied to all property alike takes such property for public use without compensation.

It is finally suggested in the opinion that the relator may find relief in a hearing upon the assessment roll. But in the face of the statute declaring that his property, being unimproved, shall not be considered damaged by the fill, the positive declaration of the city in its answer to his complaint that it "has a lawful right to . . . fill private property without the payment of damage," and intends to exercise that right, and the announcement earlier in the opinion of the majority that the city will not exceed its powers in so doing, I am afraid the appellant's chances of remuneration from this final test are not of the best. But the argument is not sound for another reason, it overlooks the constitutional requirement that damages to property taken for a public use must be ascertained and paid into court for the owner before his property is taken.

The judgment appealed from should be reversed.