[No. 34849. *En Banc.* June 11, 1959.]

SHANNON HOGUE et al., *Appellants,* v. THE PORT OF SEATTLE *et al., Respondents.*[1]

[1]Reported in 341 P. (2d) 171.

*Dore, Cummings, Dubuar & Dore,* for appellants.

*Bogle, Bogle & Gates, Edward G. Dobrin, Robert W. Graham, George N. Prince, The Attorney General* and *Robert F. Houth, Assistant,* for respondent Port of Seattle.

*John H. Binns, amicus curiae.*

DONWORTH, J.—This action was initiated by appellants as taxpayers on their own behalf, and on behalf of all other taxpayers similarly situated, for a declaratory judgment and injunctive relief against the respondents, who are the Port of Seattle and certain public officers concerned with the enforcement of the statutes involved in this litigation.

For convenience, appellants will be referred to as the Tax-payers and the principal respondent as the Port.

The two statutes involved in this case are Laws of 1957, chapter 265, p. 1036 (RCW 53.36.100), herein referred to as the 1957 act, and Laws of 1955, chapter 73, p. 429 (RCW 53.25), herein referred to as the 1955 act.

The Taxpayers have challenged the constitutionality of the 1957 act and seek to enjoin the expenditure of the proceeds derived from the tax levy made pursuant thereto. The act authorizes an annual two-mill levy (for six successive years only) by a port district that has adopted a comprehensive scheme of harbor improvements and industrial developments, and further provides that the proceeds of such tax must be used exclusively for the exercise of those powers granted to port districts by the 1955 act. Thus, the 1957 act, in effect, incorporates by reference the provisions of the 1955 act, so that, in order to pass on the constitutional validity of the 1957 act, it is necessary to first consider the constitutionality of the 1955 act.

The provisions of the 1955 act will be more fully discussed below. At this point, it is sufficient to state that the act, in general, authorizes port districts to create industrial development districts; declares that lands having certain characteristics shall be classified as marginal lands; provides for the acquisition and development of marginal lands by port districts and the sale or lease thereof by them to private entities, and for the redevelopment of such lands by private enterprise. The act also authorizes port districts to acquire all lands within an industrial development district after they have been made a part of the comprehensive scheme of harbor improvements and industrial developments.

In the trial court, the Taxpayers requested, but were denied, a temporary injunction. Trial was subsequently had upon the Taxpayers' amended complaint, which was further amended during the trial. The trial amendment alleged that the findings and determinations of the Port contained in its resolution No. 1814 were wholly without foundation in fact, and were arbitrary and capricious. The evidence

encompassed a wide range of subjects, including engineering, zoning, economics, flood control, and statistics concerning industrial conditions in the Seattle area. Ninety-nine exhibits were admitted, including five engineers' reports of considerable length, and minutes of various citizens' committees and other groups which were concerned about the existing industrial conditions in the locality and also the contemplated construction of the Eagle Gorge Dam. The trial court entered findings of fact similar to the facts stated in resolution No. 1814, which the court found were not arbitrarily or capriciously adopted. Judgment was rendered for the Port, wherein the constitutionality of both the 1955 act and the 1957 act was upheld and the Taxpayers' request for injunctive relief was denied. The Taxpayers' subsequent motion for judgment notwithstanding the court's oral decision or, in the alternative, for a new trial, was denied, and the Taxpayers have appealed to this court.

The case has been argued twice before this court, which sat *en banc* on both occasions. The briefs submitted totaled more than three hundred pages, including an *amicus curiae* brief which was filed on behalf of the Washington State Public Port Authorities Association, whose membership consists of twenty-one port districts in the state of Washington. The attorney general, who was named as a party defendant, has advised us that he concurs in the brief filed by the Port. The questions which we are called upon to decide are of paramount public importance.

In order to place the questions presented in their proper perspective, it is necessary to briefly relate certain historical facts underlying the enactment of the statutes challenged in this case.

In 1911, the legislature provided for the creation of port districts. Shortly thereafter, the Port of Seattle was organized and it adopted a comprehensive scheme of harbor improvements, which has been amended from time to time. During this same period, Commercial Waterway District No. 1 was formed, pursuant to the applicable statutes, and it undertook the project of dredging and straightening the

Duwamish River from Elliot Bay upstream for a distance of about five or six miles. Subsequent to the completion of this project and the creation of Harbor Island, a number of industrial plants have located in the lower Duwamish area.

Since the end of World War II, there has been a growing concern among civic leaders and public officials over the imbalance of industrial employment in the Seattle area. Statistics indicated that the Boeing Airplane Company alone employed over half of the industrial employees in the area. They further showed that the net employment increase in all other manufacturing activities has been at a rate of one per cent a year, which is not sufficient to keep pace with the natural increase in population experienced by the Seattle area. It was therefore apparent that Seattle was increasingly becoming a one-industry town. Various committees were organized to consider this problem. After numerous meetings, they came to the conclusion that, if Seattle is to have normal industrial growth, immediate steps should be taken to develop a sound program for broadening and strengthening its industrial base.

In 1951, legislation (Laws of 1951, chapter 33, § 1, p. 78) was enacted to authorize the city of Seattle, the port district, and King county to:

". . . participate jointly in surveys, investigations and studies for determining the location, type and design, with cost estimates, of a project plan for the improvement of any section or sections, within or without the limits of such city, of any navigable river emptying into tidal waters in such city, in aid of commerce and navigation and in aid of the comprehensive land use and development of such river valley, including present and future industrial and manufacturing uses."

Pursuant to this legislation, the Duwamish and Green River Joint Survey Board was created. This board retained a New York engineering firm to make a study for the industrial development of the Duwamish-Lower Green River Valley, and these engineers submitted a final report to the joint board in 1954. The report predicted rapid in-

dustrial development in the Puget Sound area to 1970, and found that the Duwamish-Lower Green River Valley was the most logical location for such development, and submitted a detailed plan therefor. The report also recommended that the Port of Seattle be the agency to construct and supervise the operation of this industrial development, and suggested that several changes be made in the port district laws and in the existing industrial development district act, which was originally enacted in 1939.

To this end there was formed, in 1953, the industrial development council of Seattle and King county. Included in this group were representatives of the city of Seattle, King county, and the port district as well as civic and business groups. In 1957, a mayor's citizens committee was established in Seattle to study the problem and recommend a course of action that would place the local industrial economy on a sound basis. Each of these groups concluded that the lack of suitable industrial sites was one of the major deficiencies of the Seattle area.

Accordingly, new legislation was prepared with the assistance of the Seattle-King county industrial development council, and the 1955 act (known as the industrial development district act) was enacted.

Then, in 1957, the legislature passed the tax act under which the two-mill tax here in question was levied.

Pursuant to these two statutes, the port district initiated the procedure for the improvements recommended for the industrial development of the Duwamish-Green River Valley on June 20, 1957, by holding a public hearing, after due notice, at which resolution No. 1814 was adopted by the port commissioners.

Basically, this resolution (which consists of ten typewritten pages) accomplished three things:

(1) It created the Duwamish Industrial Development District (herein called the Duwamish District), which encompasses an area of approximately 2,175 acres lying in the Duwamish Valley and lower Green River Valley.

(2) It set forth various determinations and findings of

the port commission, foremost of which was the finding that *all* the lands within the Duwamish District were marginal lands.

(3) It established a comprehensive scheme of harbor improvements and industrial development.

Incorporated within this comprehensive scheme was a modified version of the plan that had been proposed by the New York engineering firm in their 1954 report. It called for the extension of the present Duwamish waterway by the construction of a ship channel thirty feet deep and four miles long from the existing end of the waterway to Renton Junction Way, and a barge channel fifteen feet deep from there to south 180th street, a distance of one and one-half miles; the acquisition, by purchase or condemnation or any other lawful means, of *all* the land situated within the Duwamish District, and the filling, grading, and draining of such land so as to create industrial sites; the construction of access and service roads with suitable connections to existing highways and projected freeways; the construction of a network of lead tracks and main spurs, located so that industrial sidings could be readily provided for all sites; the installation of a water supply, sewerage, electric power, gas, and other utilities to properly serve the industrial sites created.

Although resolution No. 1814 contained no reference as to the amount of acreage that was to be allocated to any particular project or improvement, the evidence adduced at the trial shows that the area required for the new channel of the Duwamish River (after it is straightened and deepened) and the installation of roads, rail spurs, and sewers will be some 840 acres. Another area of 300 to 400 acres, located between the present head of navigation (which is approximately five miles south of the mouth of the Duwamish River) and Renton Junction Way, is to be reserved for the future location of certain port facilities (grain elevator, petroleum terminal, ore dock, roll-off, roll-on service, etc.), which will require the use of approximately sixty-seven acres therein. Parenthetically, no men-

tion is made in resolution No. 1814 of the port facilities just referred to. It is anticipated that there will then be between 900 to 1,000 acres left available for sale or lease to private industrial concerns. It is also estimated that the excavation of the waterway will produce about twenty-three million yards of spoil, and the entire development area of the Duwamish District not devoted to the waterway is required for the deposit of this spoil.

On August 29, 1957, the Port adopted resolution No. 1850 in accordance with the authority granted by the 1957 act, pursuant to which the two-mill levy here in question was assessed.

The Taxpayers have made thirty-seven assignments of error. To list each assignment individually would lengthen this opinion beyond all reasonable proportions. Accordingly, we shall dispose of these assignments by discussing certain legal questions which they necessarily present.

The principal question presented is the validity of the two-mill tax levy authorized by the 1957 act.

Before discussing the grounds of invalidity advanced by the Taxpayers, which are based on the use to which the tax proceeds may be devoted, we shall consider three contentions of appellants based on other claims of unconstitutionality. The first of these is that the tax levy violates the forty-mill limit imposed on general property taxes by Art. VII, § 2, as amended by amendment 17 of the state constitution, which provides, in part:

"Except as hereinafter provided and notwithstanding any other provision of this Constitution, the aggregate of all tax levies upon real and personal property by the state and all taxing districts now existing or hereafter created, shall not in any year exceed forty mills on the dollar of assessed valuation, which assessed valuation shall be fifty percentum of the true and fair value of such property in money: *Provided, however*, That nothing herein shall prevent levies at the rates now provided by law by or for any port or public utility district. The term 'taxing district' for the purposes of *this section* shall mean any political subdivision, municipal corporation, district, or other governmental agency authorized by law to levy, or have levied for it,

ad valorem taxes on property, other than a port or public utility district. . . ."

It is claimed that the first sentence of the proviso, "That nothing herein shall prevent levies at the rates now provided by law by or for any port or public utility district," restricts the power of the legislature so that it may not authorize levies by the Port exceeding those allowed in November, 1944, when the seventeenth amendment was adopted.

If this were the correct construction to be given this sentence, then the exclusion of port districts from the category of "taxing districts" would be meaningless. We think it clear that, by expressly defining the term "taxing districts" to exclude port districts, it was the intention of the people in adopting . the seventeenth amendment, that neither the forty-mill limitation on taxing districts nor the language of the first sentence of the proviso should have the effect of limiting in any manner the taxing power of port or public utility districts as to millage. In short, the amendment has no application to such districts.

It is next contended that the object of the tax is not definitely stated, in violation of Art. VII, § 5, of the state constitution which provides:

"No tax shall be levied except in pursuance of law; and every law imposing a tax shall state distinctly the object of the same to which only it shall be applied."

There is no merit in this contention. It is questionable whether the constitutional provision even applies to a statute of this type. Rather than directly imposing a tax, the 1957 act merely authorizes a tax levy. In any event, the object or purposes of the tax are set forth in the 1955 act, and by reference are as much a part of the 1957 act as if they had been explicitly written therein. *Pacific First Fed. Sav. & Loan Ass'n v. Pierce County,* 27 Wn. (2d) 347, 178 P. (2d) 351 (1947), and cases cited.

Directing our attention to the 1955 act, it is asserted that the act is unconstitutional in that: (a) Sections 4 and 10 purport to provide for the development of harbor improve-

ments, which constitutes a subject other than industrial development of marginal lands; and (b) that the subject of harbor improvements is not expressed in the title of the 1955 act, all in violation of Art. II, § 19, of the state constitution, which provides:

"No bill shall embrace more than one subject, and that shall be expressed in the title."

█ █ █ Neither objection is valid. The title clearly shows that the act pertains to industrial development generally. Harbor improvements are simply a form of industrial development. The title need not be an index to the contents of the act. It is necessary only that the title shall state the general purpose and scope of the act, so that, making every reasonable intendment in favor of the act, it may be said that the subject is expressed in the title. *State ex rel. Zenner v. Graham,* 34 Wash. 81, 74 Pac. 1058 (1904).

In order to decide the principal question presented by this appeal, it is necessary to have in mind various provisions of the 1955 act and, in connection therewith, to point out certain parts of resolution No. 1814 adopted by the Port pursuant to the statute.

The 1955 act commences with the following declaration, in § 1:

"It is hereby declared to be the public policy of the legislature of the state of Washington, that it is in the public interest to employ the power of eminent domain and advance and expend public moneys for the purposes herein contained, and to provide for means by which marginal area properties may be developed or redeveloped in accordance with the legislative policies hereinafter stated: . . ."

There then follow six separate declarations to the effect that development and redevelopment of marginal lands is necessary for the economic security of the peoples of the state of Washington, and that the general welfare of the inhabitants of port districts requires the remedying of the injurious conditions characterizing marginal lands; that such development and redevelopment cannot be accomplished without public participation; that it is in the public

interest to employ the power of eminent domain and expend public moneys for such purposes; that the development or redevelopment of such marginal lands and the provision for appropriate continuing land use are public uses and purposes of state concern in the interest of health, safety, and welfare; and that the question of necessity in the public interest for the provisions of the act is a matter of legislative determination.

Section 2 consists of ten further declarations, which are somewhat repetitious of those contained in § 1, except that the language becomes increasingly stronger in that it is stated that the existence of such marginal lands characterized by any or all of "such conditions"[2] constitutes a serious and growing menace injurious and inimical to the public health, safety, and welfare, which presents a situation beyond remedy and control solely by regulatory processes in the exercise of the police power; that such lands contribute substantially and increasingly to the problems of crime prevention and the treatment of juvenile delinquency; that this menace is becoming increasingly direct and substantial in its significance and effect, and then concludes with:

"The development or redevelopment of land, or both, acquired under the authority of this act constitute a public use and are governmental functions, and that the sale or leasing of such land after the same has been developed or redeveloped is merely incidental to the accomplishment of the real or fundamental purpose, that is, to remove the condition which caused said property to be marginal property as in this act defined."

Altogether, there are sixteen declarations in §§ 1 and 2. Of these sixteen declarations, thirteen are found in resolution No. 1814 in substantially the same language as that used in the statute.

Before setting out the ten definitions of marginal lands contained in § 3 of the 1955 act, we deem it appropriate to state that it is well to bear in mind the fact that, if a parcel

---

[2]The words "such conditions" seem to refer to the definition of marginal lands in § 3 of the act quoted below.

of land fits within any *one* of the ten definitions, the legislature has unequivocally declared that not only is it a menace, but that it also contributes substantially and increasingly to the problems of crime prevention and juvenile delinquency.

In § 3, the term "marginal lands" is defined as lands characterized by any one or more of the following ten described conditions:

"(1) An economic dislocation, deterioration, or disuse resulting from faulty planning.

"(2) The subdividing and sale of lots of irregular form and shape and inadequate size for proper usefulness and development.

"(3) The laying out of lots in disregard of the contours and other physical characteristics of the ground and surrounding conditions.

"(4) The existence of inadequate streets, open spaces, and utilities.

"(5) The existence of lots or other areas which are subject to being submerged by water.

"(6) By a prevalence of depreciated values, impaired investments, and social and economic maladjustment to such an extent that the capacity to pay taxes is reduced and tax receipts are inadequate for the cost of public services rendered.

"(7) In some parts of marginal lands, a growing or total lack of proper utilization of areas, resulting in a stagnant and unproductive condition of land potentially useful and valuable for contributing to the public health, safety and welfare.

"(8) In other parts of marginal lands, a loss of population and reduction of proper utilization of the area, resulting in its further deterioration and added costs to the taxpayer for the creation of new public facilities and services elsewhere.

"(9) Property of an assessed valuation of insufficient amount to permit the establishment of a local improvement district for the construction and installation of streets, walks, sewers, water and other utilities.

"(10) Lands within an industrial area which are not devoted to industrial use but which are necessary to industrial development within the industrial area."

The existence of any one or all of these ten conditions is declared to be sufficient to warrant the expenditure of public funds in the acquisition and development of lands so afflicted, and to authorize their being taken from the owner or damaged for public use as provided in § 1. By § 2, the existence of such lands is declared to constitute a serious public menace which is condemned as injurious and inimical to the public health, safety, and welfare of the community and of the state of Washington.

Resolution No. 1814 contained the Port's finding that all the lands within the Duwamish District were "marginal lands" as defined in the above quoted § 3 of the 1955 act, and that all the lands described in the resolution were characterized by one or more of the conditions described in § 3 of the act.

The testimony showed that there were more than seven hundred parcels of land referred to in the Port's resolution. No attempt was made to specify which parcels are afflicted with which one or more of the conditions described in § 3. By *fiat* of the port commissioners, each and every parcel is charged with the existence of one or more of these harmful conditions, and by blanket indictment all are found to be a menace to the public health, safety, and welfare.

Section 4 of the act authorizes port districts, after holding a public hearing, to create industrial development districts when they find the creation of such districts to be "proper and desirable in establishing and developing a system of harbor improvements and industrial development in such port district."

Section 5 authorizes the county to convey to the port district tax title lands located within an industrial development district which the county commissioners deem to be "chiefly valuable for industrial development purposes."

Section 6 authorizes the port district, with the approval of the county commissioners, to accept the conveyance of privately owned lands subject to delinquent taxes which the port commission "deems valuable for industrial development purposes." Under these sections, the port district

holds such lands in trust for the county, and is authorized to manage, develop, lease and sell such lands and, out of the proceeds, to reimburse itself for any expense incurred in the management and development and to pay any balance to the county. It is important to note that in each instance the specified reason for the conveyance of such lands to the port district is their value for industrial development purposes, and that no reference whatever is made to "marginal lands" characteristics as a reason for such transfer.

Section 7 authorizes port districts to free such lands from the county trust by paying to the county the amount of delinquent taxes owing at the time of the tax foreclosure or at the time of the transfer of private property. After such lands have been freed of the county trust, the district may sell them to private persons or hold same without having included such lands in its comprehensive scheme of harbor improvement and industrial development.

Section 8 provides that such lands shall revert to the county ten years after their acquisition unless the port district has already freed the lands from the county trust as provided in § 7, or has adopted a comprehensive plan of harbor improvement which provides for the improvement of an industrial development district embracing such lands.

Section 9 consists of two paragraphs. The first paragraph forbids the making of any expenditure (other than for the preparation and submission of a plan of improvement) for improvement or acquisition of property, except those acquisitions authorized by §§ 5 and 6, until it has been made a part of "the comprehensive scheme of harbor improvements and industrial developments or amendments thereto."

The second paragraph requires that the comprehensive scheme shall provide "for the development or redevelopment of those marginal lands acquired," and for the "continuing of the land uses which are hereby declared to constitute public uses and the purposes for which public moneys may be advanced and provide [private] property acquired."

Section 10 enumerates the powers of port districts which have created industrial development districts. These powers include authority to acquire by purchase or condemnation, or both, all lands, property, and property rights necessary for the development and improvement of such industrial development district, and

" . . . to develop and improve the lands within such industrial development district to make the same suitable and available for industrial uses and purposes; to dredge, bulkhead, fill, grade, and protect such property; to provide, maintain, and operate water, light, power and fire protection facilities and services, streets, roads, bridges, highways, waterways, tracks, and rail and water transfer and terminal facilities and other harbor and industrial improvements; . . . ."

This section makes no reference to marginal lands.

Section 11 authorizes the port (when the commissioners deem it to be for the best interests of the district) to sell any property owned by it within an industrial development district in furtherance of its general plan of harbor improvement or industrial development, or both.

Sections 12 to 16, inclusive, deal with the mechanics of the bidding procedure and sale of land within an industrial district. Bidders are required to state the use which they intend to make of the property. There is nothing in the act to specifically define what such use must be. However, the over-all intent seems to be that such use must be industrial and must have a relation to the harbor and the business and facilities thereof.

Sections 17 and 18 also relate to the sale of such land by the port, and require in every instrument of conveyance the incorporation of a covenant running with the land which restricts the land to that use agreed upon between the port and the purchaser, and also makes the violation of such covenant a cause for forfeiture of the land by the port commission. No provision in the act in any way limits the nature of the conditions of covenants as to land use.

Section 19 grants all port districts which have created industrial development districts the specific power to ac-

quire, by the exercise of eminent domain, "marginal lands" within the limits of such district.

Section 20 empowers port districts to advance general fund moneys or credit, or both, "to accomplish the objects and purposes of this act," and to repay the general fund from the sale or lease of developed or redeveloped lands.

Section 21 provides that the determination of whether lands sought to be condemned are marginal lands as defined in the act is a judicial question, provided that a duly adopted resolution of the port commissioners "setting forth the characteristics of the lands" that render them marginal lands shall be *prima facie* evidence that the land is marginal as defined in the act.

Section 22 is a repeal clause expressly repealing chapter 45, Laws of 1939 (as amended in 1943), and § 23, the final section, contains a conventional severability clause to the effect that, should any section or provision of the 1955 act be held invalid, it shall not affect the validity of the act as a whole or any part thereof other than the portion held to be invalid.

It is apparent from our resumé of the 1955 act that it contains various provisions granting additional powers to port districts. The comprehensive scheme established by the Port for the Duwamish District (by its resolution No. 1814) incorporates all of these powers and thus purports to authorize expenditures from proceeds of the tax levy authorized by the 1957 act for the exercise of all powers described in the 1955 act.

It is the Taxpayers' contention that the 1957 act and the tax levy made pursuant thereto violate the state constitution in the following particulars:

1. The act authorizes port districts to appropriate private lands which, by the power of eminent domain, are taken from their owners for the private use of others, in violation of Art. I, § 16 (amendment 9).

2. The act authorizes port districts to make a gift of money and property and the loan of money or credit in aid of private persons, in violation of Art. VIII, § 7.

3. The act authorizes the levy of a tax for private purposes, in violation of Art. VII, § 1, as amended by the fourteenth amendment.

It is further asserted that, under the facts of this case, there is a violation of the due process clause of the fourteenth amendment to the Federal constitution.

The Taxpayers submit that the purpose of the act is (1) to acquire marginal lands by the use of public funds; and (2) to provide land for industrial development acquired by the Port by condemnation, and that neither purpose is a public purpose, so that the state constitution is violated in several particulars: (a) in that the power of eminent domain is being used to appropriate private lands for the private use of others, in violation of Art. I, § 16 (amendment 9); (b) in that in carrying out the plan adopted by resolution No. 1814, the Port will be making a gift of money and property and a loan of money or credit in aid of private persons, in violation of Art. VIII, § 7; and (c) in that the tax here involved is for private purposes, in violation of Art. VII, § 1, as amended by the fourteenth amendment to the state constitution.

It is argued by appellants that if the real purpose of the 1955 act is to develop marginal lands, then the lands must be marginal in fact, and must also be of such character as to be injurious to the public health, safety, and welfare.

We shall now consider whether the 1955 act is valid as an exercise of the police power of the state.

The declaration of the legislature in the first two sections of the act to the effect that the existence of marginal lands constitutes a serious and growing menace injurious and inimical to the public health, safety, and welfare, is entitled to great weight. *Randolph v. Wilmington Housing Authority* (Del.), 139 A. (2d) 476 (1958).

In the instant case, neither this legislative declaration, nor the findings in resolution No. 1814, nor the findings of the trial court as to the marginal characteristics of the land here involved, is supported by any evidence, except the

finding of the trial court (No. XII) that substantially all of the lands are subject to annual floods.

Later in this opinion, we will show that the evidence preponderates against finding No. XII.

Consequently, we are here concerned only as to the validity of the 1955 act as applied to the land in the Duwamish industrial development district.

■ The legislative declaration that the development and redevelopment of these lands as provided in the act constitute a public use, is a question to be ultimately decided by this court, under Art. I, § 16, of our constitution, as amended (amendment 9). This matter will be given further consideration later in this opinion.

In *Crommett v. Portland,* 150 Me. 217, 235, 107 A. (2d) 841 (1954), the court upheld the validity of a slum clearance and redevelopment authority law as applied to a certain area in the city of Portland under the facts of that case. However, the court, after referring to the presumption of constitutionality and to the public use question, limited its decision as follows:

"The determination of whether an area is 'blighted' or 'slum' under the statute must rest upon facts directly bearing upon the public health, safety, morals or welfare. Consideration of other facts not so grounded, however, does not affect the validity of the finding, if the pertinent facts are in themselves sufficient to show the 'blighted' or 'slum' condition. The Vine-Deer-Chatham Project Area is properly a 'blighted area' under this test.

"Several of the conditions stated in the statute in clauses 1 and 2 of Section 3(g) *supra,* and particularly in clause 2, do not in our view touch upon a public use. Examples are found in 'faulty lot layout,' 'deterioration of site,' 'diversity of ownership,' 'defective or unusual conditions of title,' 'improper subdivision or obsolete platting,' or 'mixture of incompatible land uses.' Nor are public uses involved in correcting a condition from which an area 'substantially impairs or arrests the sound growth of the municipality, or constitutes an economic or social liability.' The public use, as we have said, is found in the course of conditions harmful to the public health, safety, morals or welfare.

" . . .

" . . . Private uses will be permitted, but only to the extent the purposes of public health, morals, safety and welfare benefited by the clearance of the area remain unaffected."

The *Opinion of the Justices*, 152 Me. 440, 131 A. (2d) 904 (1957), involved a proposed statute permitting the city of Bangor to acquire land, by purchase or condemnation, for the purpose of creating an industrial park, portions of which the city could sell or lease to private entities as factory sites, etc. In advising that the proposed statute would be unconstitutional, the justices said:

"We prefer to place our answer upon consideration of the basic purpose of the Act. This, we are compelled to find, is a private purpose and not a public purpose under our constitution. It follows that the city may neither raise money by taxation nor acquire property by eminent domain for such purpose. There is neither the 'public use' of taxation, nor the 'public use' of eminent domain. . . .

"Under the Act the city does not seek to regulate the use of land through zoning. The plan calls as we have seen for the acquisition of property against the will of the owner if need be, with its placement in industrial use by private enterprise."

While the question has never been passed upon by this court, there are numerous decisions from other states relating to the constitutionality of so-called urban redevelopment statutes (slum clearance or blighted area laws) which have been referred to in the briefs. In those cases where such acts have been held valid, there has been found a rational connection between the evil sought to be cured and the means adopted by the legislature to cure it. Furthermore, in each such case there has been convincing proof of specific facts definitely establishing the actual existence of slum conditions which affected the public health, safety and morals. To review all these decisions would unduly add to the length of this opinion. For convenience, reference to such citations is made below.[3]

---

[3]The decisions of courts of last resort decided prior to 1956 on the general subject of the validity of various state statutes relating to slum clearance, redevelopment of blighted areas, and similar urban develop-

We shall now refer to several decisions on which respondents particularly rely. In *Redevelopment Agency of San Francisco v. Hayes,* 122 Cal. App. (2d) 777, 266 P. (2d) 105 (1954), the court, in upholding the validity of a community development statute as applied to the Diamond Heights area in San Francisco, closed its opinion with this admonition:

"It should be emphasized that it is the combination in Diamond Heights of practically all the blight conditions mentioned in section 33042, subdivisions (a) to (d), showing a definitely compelling economic need, which permits the use of the act. Public agencies and courts both should be chary of the use of the act unless, as here, there is a situation where the blight is such that it constitutes a real hindrance to the development of the city and cannot be eliminated or improved without public assistance. It never can be used just because the public agency considers that it can make a better use or planning of an area than its present use or plan. As said in *Schneider v. District of Columbia, supra,* 117 F. Supp. 705 '. . . it behooves the courts to be alert lest currently attractive projects impinge upon fundamental rights.' "

In the case cited in the foregoing quotation (which upheld an act of Congress relating to the District of Columbia) the three-judge court sounded a similar warning:

"Third, we have the problem of the area which is not a slum but which is out-of-date, called by the Government 'blighted' or 'deteriorated'. The Government says the statute is not limited to slum clearance but extends to what is called 'urban redevelopment'; and that as thus construed the statute is valid. The word in the statute upon which the Government rests its view is 'blighted', which is not defined in the statute. A hint of a meaning such as that urged by the Government is found in the phrase 'backward and stagnant and therefore blighted', which appears near the end of Section 3(n) of the Act. But we have already indicated our conclusion that the more direct provisions of the statute control its scope, that it is the clearly expressed intent of the Congress to authorize in this statute the seizure

---

ment laws, are discussed in the annotation found in 44 A. L. R. (2d) 1414. The cases decided since that annotation was prepared (which have been called to our attention) are referred to later in this opinion.

of property only for the purpose of eliminating and preventing thereafter conditions injurious to the public health, safety, morals and welfare. If we did not find this meaning clear upon the face of the statute, we would be impelled to construe it with that meaning, because otherwise the statute would be unconstitutional.

"The contention as to 'blight' and 'urban redevelopment' would cover two possible factual situations: one where the plan is to redevelop an area in which no slums exist, and the other where the plan is to redevelop an area which the Government deems 'appropriate' for redevelopment but upon only a part of which slums exist. We first discuss the two possibilities separately.

"The hypothesis in the first phase of this consideration is an urban area which does not breed disease or crime, is not a slum. Its fault is that it fails to meet what are called modern standards. Let us suppose that it is backward, stagnant, not properly laid out, economically Eighteenth Century—anything except detrimental to health, safety or morals. Suppose its owners and occupants like it that way. Suppose they are old-fashioned, prefer single-family dwellings, like small flower gardens, believe that a plot of ground is the place to rear children, prefer fresh to conditioned air, sun to fluorescent light. In many circles all such views are considered 'backward and stagnant.' Are those who hold them 'therefore blighted'? Can they not, nevertheless, own property? Choice of antiques is a right of property. Or suppose these people own these homes and can afford none more modern. The poor are entitled to own what they can afford. The slow, the old, the small in ambition, the devotee of the outmoded have no less right to property than have the quick, the young, the aggressive, and the modernistic or futuristic."

A decision not mentioned in the briefs appears to bear upon the question before us. *Bristol Redevelopment & Housing Authority v. Denton*, 198 Va. 171, 93 S. E. (2d) 288 (1956), involved the validity of a city ordinance (enacted pursuant to the housing authorities law of Virginia) approving a slum clearance and redevelopment plan proposed by the redevelopment and housing authority covering a certain area in the city of Bristol. The findings of the authority that this area was a slum, blighted, and deteriorated

area were held to have been arbitrarily and capriciously made. In so holding, the supreme court of appeals said:

"It is of course well settled, as the appellants argue, that 'Since the determination of questions of fact on which the constitutionality of statutes may depend is primarily for the legislature, the general rule is that the courts will acquiesce in the legislative decision unless it is clearly erroneous, arbitrary, or wholly unwarranted.' 11 Am. Jur., Constitutional Law, § 144, p. 823. Or, as another authority states it, 'The determination of the . . . facts on which the validity of a statute depends is primarily for the legislature', subject to review usually only where 'manifestly arbitrary or unreasonable.' 16 C. J. S., Constitutional Law, § 151(3), p. 763. See also, 4 Mich. Jur., Constitutional Law, § 55, pp. 145, 146. If the question 'is fairly debatable and the legislative determination is not manifestly arbitrary or unreasonable,' it must be sustained. 16 C. J. S., Constitutional Law, § 151(3), pp. 763, 764. See also, *Reynolds v. Milk Commission*, 163 Va. 957, 967, 179 S. E. 507, 510; *Mumpower v. Housing Authority*, 176 Va. 426, 443, 11 S. E. (2d) 732, 738.

"On the other hand, legislative conclusions based on findings of fact are not immune from judicial review where they are arbitrary and unwarranted. 16 C. J. S., Constitutional Law, § 151(3), p. 764. . . .

"It will be observed that in order for an area to qualify as 'blighted or deteriorated,' not only must the buildings and improvements therein be in the specified physical condition, but 'by reason of' such condition the area must be 'detrimental to the safety, health, morals or welfare of the community.'

"Thus, the condition of an area is the very basis of the jurisdiction and power of a redevelopment authority to acquire property located therein by eminent domain. Code, § 36-50. Unless the area meets this definition the authority has no power to acquire it and the council has no basis for the approval of such taking. In this situation, the court has the right to determine whether the area is in fact 'blighted or deteriorated' as defined in the statute. Code, § 36-49(1)."

In affirming the trial court in enjoining the Authority from carrying out the plan, the appellate court concluded:

"It thus appears that the basic contention of appellants is that the area as a whole qualifies for redevelopment because it is a 'blighted or deteriorated' area as defined in sec-

tion 36-49 (1). Since the evidence clearly shows that the area as a whole does not meet that statutory definition, it necessarily follows that the action of the local Authority in finding that because of this condition the property should be acquired for redevelopment purposes, and the action of the council in approving the project, were devoid of legal authority, arbitrary and unwarranted. Consequently, the appellees were entitled to the relief prayed for in their bill."

The supreme court of Delaware, in *Randolph v. Wilmington Housing Authority* (Del.), 139 A. (2d) 476 (1958), upheld the condemnation of private property for slum clearance and its redevelopment by private interests under conditions designed to prevent the recurrence of slums and approved the use of public funds therefor. During the course of its opinion, the court stated:

"But we expressly confine this holding to the sections of the Slum Clearance Act here before us. The questions submitted to us are very broad. They apparently call for an opinion on the validity of every provision of the Act. Such an opinion we decline to give, because we do not think that the certification provision of our Constitution (Art. IV, Sec. 11 (9) ) was intended to require us to answer questions not presented by the facts before the court below. Our rule provides for the certification of questions 'arising in the cause'.

"Accordingly, the finding of constitutionality here made is limited to those sections of the act applicable to the facts presented. There are other sections of the act the application of which would certainly raise much more doubtful questions. For example, the act undertakes to grant the power of eminent domain to eliminate a 'blighted area', as that term is defined in § 4501. A 'blighted area' is one embodying 'any combination' of ten factors or conditions set forth in the section. Only two of these appear to have any direct relation to public health, safety or morals, i.e., unsanitary or unsafe conditions, and conditions endangering life or property by fire or other causes. These factors, however, add nothing to the definition of a slum area in the same section. The other factors, such as 'defective or inadequate street layout', 'diversity of ownership', 'tax or special assessment delinquency exceeding the fair value of the land', 'unusual conditions of title', 'improper subdivision', etc., have no direct relation to public health, safety or morals. They seem to reflect the idea that the State may

take A's property away from him for such diverse reasons as that it is not used in the most efficient or economical manner, or is in a district improperly or inartistically laid out, or is in an area including some properties having 'diversity of ownership', and may sell it to B so that B may develop it in a more efficient manner.

"Now, the City Council by one of its resolutions determined the Poplar Street project to be a 'slum and blighted area'. Presumably, this reference to 'blighted area' is based on the finding of the existence of the two conditions first above referred to relating to unsanitary or unsafe conditions, and danger of fires. We expressly disclaim any implied approval of the finding that the Poplar Street project area is a 'blighted area', or that condemnation of plaintiff's property could rest upon such a finding. We have the very gravest doubt of the right of the State under our Constitution to condemn private property on the eight grounds which are set forth in the definition of a 'blighted area' above referred to, and which have no direct relation to public health, safety or morals."

The justices of the supreme judicial court of Massachusetts, in giving their opinion on a proposed legislative bill which involved a similar problem, said:

"We are not unmindful of the proposed 'Legislative Declaration of Necessity' in § 2 of the act to the effect that the tax structure of the city is threatened; that the yard will be an area of 'economic blight' and 'a potential breeding place for crime and juvenile delinquency' and will adversely affect values; that the development of the yard in the manner proposed is 'necessary to support the economic well-being of the city and the commonwealth'; that private enterprise will not undertake the orderly and integrated development of the yard, with further recitals setting forth the advantages of the plan. Nevertheless there is no suggestion that the area is now a slum. There is only an apprehension lest it become one. There would seem to be other means, perhaps through building and zoning regulations, of preventing that result. The project is not a slum clearance one, and the principle on which rest such cases as *Papadinis v. Somerville,* 331 Mass. 627, *Despatchers' Cafe Inc. v. Somerville Housing Authority, ante,* 259, and *Berman v. Parker,* 348 U. S. 26, is not applicable. Neither does the area appear as yet to be blighted in any other sense than that

high taxes and declining values retard development—a thing that could with equal accuracy be said of a great many tracts of land in Boston and in other cities in the Commonwealth. The main difference between the area we are now considering and such other tracts seems to be that the location of this tract makes it more prominent than many others, and this is hardly a difference in principle. It seems plain that the primary design of the bill is to provide for the acquisition of the area by the use, at the outset at least, of substantial sums of public money and later of comparatively small sums, to formulate a plan for development, including the devoting of some portions of the area to truly public uses, and the return of the remainder to private ownership to be rented or sold for private profit, with the expectation that adjacent areas and the city as a whole will benefit through the increase of taxable property and of values. But this kind of indirect public benefit has never been deemed to render a project one for a public purpose. . . ." *Opinion of the Justices*, 332 Mass. 769, 782, 126 N. E. (2d) 795 (1955).

We have carefully considered and given respectful weight to the legislative recitals involved in this case. However, in view of the above quoted and cited authorities, we have serious doubt as to the validity of the 1955 act because, in our opinion, there is no reasonable relationship between the acquisition of marginal lands and the promotion of the public peace, health, and safety. But we do not find it either necessary or proper for us to pass upon this grave constitutional question, because we are limited in this opinion to the facts now before us as embodied in resolution No. 1814 and the findings of the trial court. We are not required to decide whether or not any state of facts could reasonably be conceived to exist which would justify the taking of lands as marginal lands by the use of eminent domain.

We do hold that under the facts of this case the lands here involved cannot be constitutionally acquired by the Port as marginal lands. As the trial court stated in its oral decision:

"Now the question presented is, is this proposed project, as it is now approved, a proper exercise of the public power

to condemn or is it an unconstitutional attempt to take privately-owned lands to be given, sold or leased to other private parties?

"The cost of the entire project has not been stated in the testimony as I recall, but the figure of $24,000,000.00 was given for the cost of dredging and some of the development but not including the cost of the land, if I recall correctly.

"Now, many witnesses for the plaintiffs, who are taxpayers, have testified as to the uses made of some of the 720 pieces of land which comprised the 2175 acres in this project. These people and their families or predecessors have had farms, small businesses and homes in this Valley for more than 75 years; they lived in a rural atmosphere during all that time; they like it as it is and they resist the effort to industrialize the Valley and make it into an industrial park."

Under the undisputed evidence in this case, the lands involved are not congested urban lands, nor unoccupied lands, nor tidelands, nor wild, undeveloped lands. Rather, they are well-developed agricultural and residential lands situated in King county outside the city limits of Seattle.

The only evidence which tended to support the Port's contention that this is a reclamation project was testimony (supported by photographs) to the effect that a *minor* portion of the land had been flooded fourteen times in recent years during the winter months. The construction of the Eagle Gorge Dam (currently in progress) was expected to materially reduce but not entirely eliminate future flooding. There was no showing that the flooding in the past had seriously interfered with the use of this land for agricultural and other purposes for which it has been used for many years.

These lands are not being acquired to eliminate a slum or blighted area, or to destroy conditions that breed crime or disease, or to remove buildings that are dilapidated and dangerous to the occupants and the public; nor are they even being acquired to cure any of the ten conditions which purportedly cause them to be marginal lands. (See § 3 of the act.) The only "cure" suggested in the 1955 act is to permanently deprive the landowner of his land because he

has a flaw in his title, or his lot boundaries are not rectangular, or because his land has some other alleged defect described in § 3.

The evidence conclusively shows that the Port's real purpose is to acquire these lands (with the proceeds of the two-mill levy) in order to provide potential industrial sites for future use by persons, firms or corporations engaged in business for profit who may desire to establish factories, warehouses, machine shops or other industrial enterprises in the area.

Thus, the basis for acquiring this property by eminent domain really rests upon the theory that the Port can condemn this fully developed agricultural and residential land because the Port can devote it to what it considers a higher and better economic use (to sell it as industrial sites). The purported authority to do so is grounded upon the Port commission's blanket finding in resolution No. 1814 that each of the seven hundred parcels is afflicted with one or more of the attributes of marginal lands as defined in § 3 of the 1955 act.

In support of this theory, the Port points out that the authority for land acquisition is not limited to marginal lands. Having created an industrial development district, the Port may acquire tax title property by gift from the county under § 5. Property subject to delinquent taxes may be acquired from private owners by purchase or gift under § 6. Finally, under § 10, all lands which are necessary to the development and improvement of the industrial development district may be acquired by purchase or condemnation, or both. Once the Port has acquired land, § 10 further empowers it to:

". . . develop and improve the lands within such industrial development district to make the same suitable and available for industrial uses and purposes; to dredge, bulkhead, fill, grade, and protect such property; to provide, maintain, and operate water, light, power and fire protection facilities and services, streets, roads, bridges, highways, waterways, tracks, and rail and water transfer and terminal facilities and other harbor and industrial improvements. . . ." (RCW 53.25.100)

The Port takes the position that whether or not the lands within the Duwamish District are marginal is without significance, because the Port has all the necessary power to acquire and improve these particular lands under § 10, irrespective of whether or not they be marginal lands.

As above stated, §§ 5, 6, and 10 have no relation to marginal lands. The powers conferred by these sections were previously contained in the industrial development act of 1939 (Laws of 1939, chapter 45, p. 130, as amended by Laws of 1943, chapter 166, p. 535). Under the 1939 act, the power of eminent domain relative to the acquisition of property necessary for industrial development purposes was expressly limited to land which had not been improved by the owner or his predecessors to the extent of $25,000 or more. No reference to marginal lands was contained in that statute. The 1955 act, which repealed the 1939 act, omitted the limitations on the power of eminent domain imposed by the 1939 act. The 1955 act replaced the 1939 act relating to industrial development districts and reenacted similar provisions with a prologue consisting of legislative declarations and the creation of marginal lands (§§ 1, 2, and 3). See *Port of Tacoma v. Taxpayers,* 53 Wn. (2d) 734, 336 P. (2d) 872 (1959).

The constitutionality of § 7 of the 1939 act, relating to eminent domain, was challenged in *Heisey v. Port of Tacoma,* 4 Wn. (2d) 76, 102 P. (2d) 258 (1940). However, it was held that the plaintiff could not raise the question sought to be adjudicated, and hence this court never reached the constitutional question.

In support of its theory that lands can be constitutionally acquired under § 10, irrespective of whether they be marginal lands or not, the Port chiefly relies on the following decisions: *Bowes v. Aberdeen,* 58 Wash. 535, 109 Pac. 369 (1910); *State ex rel. Reclamation Board v. Clausen,* 110 Wash. 525, 188 Pac. 538, 14 A. L. R. 1133 (1920); *Carstens v. Public Utility Dist. No. 1,* 8 Wn. (2d) 136, 111 P. (2d) 583 (1941); *Port of Umatilla v. Richmond,* 212 Ore. 596, 321

P. (2d) 338 (1958); *Atwood v. Willacy County Nav. Dist.* (Tex. Civ. App.), 271 S. W. (2d) 137 (1954).

We shall discuss each of these cases in the order in which they are cited above.

In the *Bowes* case, the city council adopted a plan to fill in both the streets and abutting private property in a wet and marshy part of the city because it was necessary to eliminate an unsanitary condition which was dangerous to the health and welfare of the residents of Aberdeen. The city was acting under the police power and disclaimed any intention to condemn the right to fill the private property. The only reference in the opinion to a constitutional taking or damaging (which was not passed upon by this court) is this *dictum*:

". . . We are of the opinion that the constitutional question thus raised may be safely disregarded, for if the city can fill the property of a private owner under the act of 1909 or the act of 1907, Laws 1907, §§ 53-56, page 657 (Rem. & Bal. Code, §§ 7636-7639), in the manner contemplated, it must be done under the exercise of its police power, and not because the legislature has undertaken to say what shall be, or rather what shall not be, a taking or damaging of property. This is a judicial question, and were we inclined to pursue it further, we would not, as at present advised, feel bound by the declaration of the legislature. . . ."

The *Clausen* case is in some respects similar to the case at bar. It involved the land settlement act of 1919 in which the legislature, in the exercise of the police power, declared that the settlement of certain "undeveloped lands in this state" by former members of the armed forces "and also industrial workers and other American citizens desiring a rural life" was necessary to the public health, safety, and welfare of the people of the state. The act created the state reclamation board with certain specified powers, including the power to lease or sell farms to qualified applicants under the conditions and limitations provided therein. The act was attacked on the sole ground that it authorized the expenditure of tax funds for a private and not a public purpose. The act did not grant the power of eminent domain.

In holding that this court was not privileged to decide that the tax involved in the land settlement act was not for a public purpose in the face of a contrary legislative declaration, the majority opinion in the *Clausen* case stated:

"We feel certain that these considerations, general as they are, lead irresistably to the conclusion that the question of public purpose involved in this case, because of its inherent nature, because of the opportunity for difference of opinion as to whether or not the purpose is public in the sense of it being a legitimate function of government, and because of the question of public policy necessarily involved in it, is one which we are not permitted to render a different decision upon than that rendered by the legislature. Is there not abundant room for arguing that the development of our unoccupied lands suitable for agriculture, by a land policy which would encourage the settlement thereon of home owning farmers, will materially contribute to the welfare of our people as a whole? Can it not be argued with a fair show of reason that not only will such a policy ultimately lead to the enhancement of the material wealth of the state, but that it will also make for better citizenship, better notions of necessity for law and order, and a sounder and saner patriotism? In the light of the debatable character of these questions, we are quite convinced that it is not within the province of the judicial branch of our state government to answer them in the negative. . . ."

The two dissenting judges stated their reasons for disagreeing with the majority as follows:

"As I gather the gist of my brother Parker's opinion, it is that the court will not declare unconstitutional an act which calls for the collection of taxes to be used in the purchase and improvement of lands to be sold to private individuals, for the reason that the legislature has decided that such taxation is for a public purpose. Courts have found this an easy way to justify the laying of taxes to be utilized in ways that appeal to them as beneficial or agreeable to their ideas of proper commercial or economic development. The purpose of the act may be highly commendable, and did it not call for the payment from the pockets of the taxpayer of money in the possession of which he is supposed to be protected by constitutional limitations, as a land development plan, it would merit the approval of those interested; but to call it a public purpose is to stretch to the breaking point all fundamental ideas of what is meant by that term."

We need not determine here whether or not the ultimate decision in the *Clausen* case was correct because, seven months after it was announced, the people amended Art. I, § 16, of the constitution by adding to the sentence reading

". . . Whenever an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be really public shall be a judicial question, and determined as such without regard to any legislative assertion that the use is public."

the following proviso:

"*Provided,* that the taking of private property by the state for land reclamation and settlement purposes is hereby declared to be for public use."

So we have here, in the last analysis, a purely judicial question under amendment 9 whether the proposed taking of these seven hundred parcels of land is really for a public use. This is so because, pursuant to the 1955 act, the Port has stated in resolution No. 1814 that it intends to use tax funds to acquire these marginal lands. Hence, if the Port has no power to acquire these lands by condemnation, it follows that the proposed use of the proceeds of the tax levy under the 1957 act is not for a public purpose.

In § 10, the legislature has declared that:

"All port districts wherein industrial development districts have been established are authorized and empowered to acquire by purchase or *condemnation* or both, *all lands,* property and property rights *necessary* for the purpose of the *development* and *improvement* of such industrial development district and to exercise the right of *eminent domain* in the acquirement or damaging of *all lands,* property and property rights and the levying and collecting of assessments upon property for the payment of all damages and compensation in carrying out the provisions for which said industrial development district has been created; . . ." (Italics ours.)

From what we have just quoted, it is readily apparent that § 10 differs from the land settlement act of 1919, because the lands there authorized to be sold to soldiers and other citizens were solely undeveloped lands and were to

be acquired by the state reclamation board without resort to the power of eminent domain. Section 10 does not limit the power of acquisition by eminent domain, or otherwise, to undeveloped, vacant, or unmarketable lands. In fact, as to the *nature* of the lands authorized to be acquired, there is no limitation whatever.

The next case (*Carstens v. Public Utility Dist. No. 1, supra*) presented the question whether a public utility district could condemn electric distribution lines of a private company located outside its municipal corporate limits. The only reason urged why the attempted condemnation was not for a public use was because the distribution lines were physically outside the district. The distinction between question of the necessity for the condemnation of certain property by a municipal corporation and the question whether it is being acquired for a public use was recognized in this court's decision. No doubt was expressed that the latter question was a judicial one. The only potential qualification of the doctrine was that the determination of the legislative body is entitled to great respect. There is nothing in the decision which is inconsistent with our conclusion in the present case.

Respondents place great reliance on the recent decision of the supreme court of Oregon, in *Port of Umatilla v. Richmond*, 212 Ore. 596, 321 P. (2d) 338 (1958). In that case, the Oregon court held that the condemnation of land for port facilities pursuant to applicable statutes constituted a public use even though a portion of the land was to be leased to private industry. The factual differences between that case and the present case are:

The Port of Umatilla sought to condemn 168 acres of "wholly undeveloped" land "consisting of sand, largely covered with sagebrush,"

" 'For the development of port facilities, wharves, dock frontage, harbor improvements, storage facilities, cargo handling facilities and for the exercising, carrying out and executing of the powers provided by law for a port.' "

No industrial development district was involved.

The landowner in that case contended (a) that the port was attempting to condemn acreage far in excess of that which could then, or in the foreseeable future, be used for port facilities, and (b) that fifteen acres were all that was reasonably necessary for such purposes, and (c) that the port was intending to lease or sell part of the property to private industry.

In the instant case, the Port of Seattle is seeking to acquire 2,175 acres of land, most of which is now being, and for many years has been, used for agricultural and residential purposes. It is not sagebrush land, nor tidelands, nor wild, undeveloped land. This is not a reclamation project, or a slum clearance project, or a blighted area redevelopment. Unlike the *Umatilla* case, the Port of Seattle does not desire to acquire this occupied agricultural and residential land for building sites for any port facilities authorized by RCW 53.08.010 and 53.08.020. It proposes to acquire this large acreage of vegetable gardens, dairy ranches, pastures for cattle, or other farm land (which is now zoned and being used for agricultural purposes) for the purpose of developing and selling these lands as industrial sites, and contends that acquisition of the lands for this purpose is a public purpose.

If the Port once acquires title to these lands, it intends to devote these farm lands to what it claims is a higher or a more desirable economic land use than the present owners are making of it by selling parcels to industrialists as provided in §§ 11 to 18, inclusive, of the 1955 act. We see no substantial similarity between these facts and those before the court in the *Umatilla* case.

In *Atwood v. Willacy County Nav. Dist., supra,* an intermediate appellate court in Texas upheld the validity of a statute permitting a port district to acquire land for the purpose of *leasing* (not selling) it as industrial sites, as being for a public use. This holding was predicated in part upon common knowledge that Texas gulf coast industrial development and the successful operation of port districts

"go hand in hand." The court said that the port commissioners did not abuse their discretion in ordering condemnation of 1,760 acres for constructing port and attendant facilities. No facts as to the nature of the land acquired—whether tidelands, sagebrush lands, marsh lands, or reclaimed lands—is stated in the opinion, so we cannot tell how much relevancy the case has to our present problem.

The decree of the trial court was based largely upon finding of fact No. 17, wherein it was found that the primary purpose of the comprehensive scheme of harbor improvements and industrial developments as provided in resolution No. 1814 was to expand the Port of Seattle, to add to its waterfront, to improve transportation into and out of the harbor, and to supply public terminal facilities.

In support of this finding, the Port cites several cases as authority for the proposition that the improvement of navigation, the development of port facilities, and the installation of streets, bridges, railroads, power lines, water lines, and the like, have long been considered to be public uses and purposes.

It is conceded that the improvement of navigation, the development of port facilities, and the installation of utilities and other improvements are for a public purpose if they are incidental to an over-all plan whose primary objective is a public purpose. The projects involved in this case are made a part of resolution No. 1814 by reference, and the primary purpose of that resolution is the determining factor as to whether the projects are public or private. Our examination of resolution No. 1814 convinces us that its primary purpose is industrial development, which is a private purpose.

In resolution No. 1814, the Port did not state that such improvements were necessary for port facilities. To the contrary, it expressly stated that "the harbor improvements hereinafter provided for are necessary for such *industrial development*."

If it had been the purpose of the Port to expand its port facilities and extend the Duwamish waterway in conjunc-

tion therewith, it could have proceeded under RCW 53.08-.010, RCW 53.08.020, and RCW 53.08.060. See *Port of Tacoma v. Taxpayers, supra.*

Instead, the Port elected to proceed under § 10 of the 1955 act, and has substantially quoted that section in resolution No. 1814 as authority for its plan. Section 10 authorizes the acquisition, development, and improvement of lands for *industrial uses* and *purposes,* and grants the power of eminent domain to acquire whatever land the Port deems necessary for *industrial development.* It authorizes the construction of waterways and the installation of utilities and terminal facilities and other harbor and *industrial developments.* The harbor improvements here authorized are to aid *industrial development,* which is simply another way of saying that they are to aid the creation of industrial sites.

In its practical operation, § 10 amounts to no more than the taking of A's property, improving such property in accordance with a general plan, and then placing it in the hands of B, in the manner provided by §§ 11 through 18, inclusive, of the 1955 act, using the proceeds of the special levy authorized by the 1957 act for that purpose.

██ ██ Since the tax involved in this case is for those purposes stated in resolution No. 1814, and since there is nothing in this resolution pertaining to the construction or installation of port facilities, it follows that finding of fact No. 17 is clearly erroneous. The only evidence relating to port facilities is the two engineers' reports submitted to the Port several months *after* the adoption of resolution No. 1814, and thus, at the time of adopting said resolution the Port could not possibly have considered any plans relating to port facilities. A port district cannot undertake any development or improvement until it has been adopted by resolution as part of its comprehensive scheme. *Port of Everett v. Everett Imp. Co.,* 124 Wash. 486, 214 Pac. 1064 (1923).

The Port argues that even though the primary purpose be deemed to be industrial development, the purposes achieved are still public purposes. Several cases are cited to

show the tendency of government to take a greater interest in the public welfare by encouraging industrial expansion, providing for unemployment compensation, and the regulation of land use through the enforcement of zoning measures. The only case cited by respondent which lends any real support to the Port's position is *City of Frostburg v. Jenkins,* 215 Md. 9, 136 A. (2d) 852 (1957), which upheld a statute authorizing the city of Frostburg to issue general obligation municipal bonds to furnish funds for the purchase of property and for aiding in the construction of buildings thereon to be sold to manufacturing corporations which agreed to locate in that city.

It does not appear that the power of eminent domain was authorized in that case. The dissenting opinion pointed out that the public purpose involved in taxation is most similar to that in eminent domain, and the city of Frostburg could just as well have condemned A's property and erected thereon a factory for B with public funds, and, under the majority opinion, such would be a public purpose.

In 1955, the justices of the supreme judicial court of Massachusetts, and, in 1957, the justices of the supreme judicial court of Maine passed upon the question now before us in *Opinion of the Justices, supra,* and both flatly rejected contentions identical with the Port's present position. We prefer to follow those opinions in this decision, since we think they are correct in both law and reason.

In view of the severability clause in § 23 of the 1955 act, our decision here does not necessarily render the entire statute invalid. An act should not be declared unconstitutional in its entirety because one or more of its provisions is unconstitutional, unless the invalid provisions are unseverable and it could not be reasonably believed that the legislature would have passed the one without the other, or unless the elimination of the invalid part would render the remainder of the act incapable of accomplishing the purposes of the legislature. *State v. Lawton,* 25 Wn. (2d) 750, 172 P. (2d) 465 (1946).

As we previously indicated, our decision, in so far as it

relates to those provisions of the act pertaining to marginal lands, is confined to the facts of this case.

## *Conclusion*

We have considered all the assignments of error, as well as the lengthy arguments in the several briefs relative thereto. Our conclusions, briefly stated, are:

(1) The provisions of Laws of 1955, chapter 73, relating to contemplated condemnation of "marginal lands," as applied to the Duwamish District, violate the provisions of amendment 9 of the state constitution, and are null and void.

(2) The provisions of § 10 of the act, relating to the condemnation of land *other than* marginal lands, are null and void for the reason that they purport to authorize the condemnation of such land for a private purpose, to wit, the development and sale thereof to private entities for use as industrial sites.

(3) The trial court erred in stating, in finding of fact No. 17, that the primary purpose of the adoption of resolution No. 1814 was "to supply public terminal facilities" of benefit to the entire metropolitan area of Seattle, since no provision was included in resolution No. 1814 for any such facilities whatever. The resolution related only to the condemnation and development of the property within the Duwamish District for the purpose of the ultimate sale thereof by the Port to private investors for industrial use as provided in the 1955 act.

There is evidence in this case that various groups of civic leaders and public officials are genuinely concerned about the industrial development of Seattle and the adjacent area. There was expressed in the testimony the opinion that, unless the Port were given the power to acquire and develop the lands in the Duwamish District, Seattle would have to be "written off" as an industrial city. The legislature, whose sole prerogative it is to determine such matters of policy, has endeavored to find a solution to the problem by enacting the statutes now under consideration. It is

our function to determine whether the legislative solution is within the framework of the constitution.

No matter how desirable from an operating standpoint the Port's exclusive control of land use in a given area may appear to be, it is the duty of the courts to uphold the rights of private property owners against the inroads of public bodies who seek to acquire it for private purposes which they honestly believe to be essential for the public good.

The people of this state have placed in our constitution (Art. I, § 16 (amendment 9)) two restrictions on the power of the state and its municipal subdivisions to acquire private property. Without these two restrictions, the sovereign power to take private property would literally be without limitation. One limitation is that just compensation therefor (as fixed by a jury) must first be paid to the owner, and the second limitation is that a court must determine whether the use for which the property is sought is really a public use. These two restrictions were placed in the constitution for the protection of private property, and each one is equally as important to the property owner as the other. In other words, it is just as important that the proposed use of the property be limited to what the court decides to be a "really public" use as it is that the property owner be given just compensation.

It should be understood that the fulfillment of one requirement by the payment of just compensation does not obviate the necessity of compliance with the other constitutional requirement that a court find that the use for which the property is sought to be taken by the state is for a "really public" use.

Thus the property owner is assured that, until our state constitution is amended, he may continue to own, possess, and use his property (for any lawful purpose) regardless of whether the state or any subdivision thereof may devise a plan for putting the property to a higher or better economic use than that to which the owner is currently devoting it. Unless the state or its subdivision can prove to the

satisfaction of a court that it seeks to acquire the property for a "really public" use (and also pays just compensation for it), the owner may not be deprived of it without his consent.

 In the present case, the Port argues that the ultimate sale by it of parcels of land within the Duwamish District to private industrialists pursuant to §§ 11 to 18, inclusive, of the 1955 act, is merely incidental to the other purposes of the act. However, resolution No. 1814 clearly shows that the Port's principal object in adopting the comprehensive scheme therein described is to obtain title to, and permanent land use control of, the land in the project area. The power to sell the various parcels with a covenant running with the land permanently freezing the use thereof (as the Port may determine) is the prime purpose of the plan and cannot be said to be incidental to any other purpose manifested in the 1955 act.

 Since the proposed condemnation of the land involved in this case is not for a public use, the proposed use of the proceeds of the two-mill levy under Laws of 1957, chapter 265, is not for a public purpose.

It follows from what has been said that the judgment of the trial court must be reversed, and that a decree be entered permanently enjoining the several defendants named in the complaint (and their respective successors in office) from performing any official act under the authority of Laws of 1957, chapter 265, relating to the levy of a two-mill tax on the real and personal property situated within the corporate limits of the Port of Seattle for the purpose of the Duwamish Industrial Development District created by resolution No. 1814 adopted by the Port of Seattle Commission on June 20, 1957, or from disbursing any taxes heretofore or hereafter collected pursuant to any such levy for the purposes of the Duwamish District.

It is so ordered.

WEAVER, C. J., HILL, ROSELLINI, OTT, and FOSTER, JJ., concur.

FINLEY, J. (dissenting)—The majority opinion commences by ably reviewing the significant facts in the history of the efforts of the Port of Seattle and other public and private groups to plan intelligently for the future industrial development and economic welfare of the Puget Sound area, the state of Washington and the citizenry thereof.

Thereupon, the majority discusses at some length the "marginal lands" concept of the 1955 Act (Laws of 1955, chapter 73, p. 429 (RCW 53.25)). This concept, apparently, was borrowed from modern slum-clearance legislation enacted elsewhere, and its presence in the 1955 Act is a bit jarring, to say the least. Perhaps the answer lies in the effort of the legal draftsman attempting to confer some semblance of orthodoxy or acceptance upon the unusual, if not actually unorthodox, yet challenging program of industrial development envisioned by our legislature.

But whatever its ancestry, I agree with the majority that the importation of the concept via the 1955 Act is not convincing, and that it does not change the basic picture respecting the constitutionality of the legislation and the program of industrial development contemplated thereunder. With all deference to the majority, it appears to me that (1) a straw man, legal or otherwise, is still a straw man, and (2) that the *marginal lands* concept of the 1955 Act actually is undeserving of the studious annihilation afforded by the majority opinion.

I see little reason to say more about the "marginal lands" notions of the 1955 Act. However, I believe § 10 of the Act is significant, and its discussion, consequently, seems to me more to the point. As to this portion of the Act, the majority opinion reads:

"Section 10 enumerates the powers of port districts which have created industrial development districts. These powers include authority to acquire by purchase or condemnation, or both, all lands, property, and property rights necessary for the development and improvement of such industrial development district, and

" ' . . . to develop and improve the lands within such industrial development district to make the same suitable and available for industrial uses and purposes; to dredge, bulkhead, fill, grade, and protect such property; to provide, maintain, and operate water, light, power and fire protection facilities and services, streets, roads, bridges, highways, waterways, tracks, and rail and water transfer and terminal facilities and other harbor and industrial improvements; . . . ' This section makes no reference to marginal lands."

To my way of thinking, there can be no question that the legislature attempted in § 10 of the Act to confer upon port districts all of the power and authority requisite for the implementation of the program of industrial development as contemplated by the Port of Seattle, and involved in the present litigation. So, the question before us is not whether the legislature has authorized the action contemplated by the Port of Seattle, but whether the action of the legislature itself, as well as the program of industrial development contemplated thereunder, transgresses the constitution of this state.

The majority opinion, and I think quite properly, states that our state constitution provides two specific safeguards for the property owner against arbitrary and dictatorial seizure of his land by the state; namely, the requirements (a) that just compensation be paid, and (b) that there be a judicial determination of *public use* before property may be taken by the state. (In connection with the latter, perhaps it should be noted at this point that amendment 9 provides that the matter of public use " . . . shall be a judicial question, and determined as such, without regard to any legislative assertion that the use is public.")

The problem of constitutionality in the instant case does not involve the matter of just compensation. It does involve the question of whether the use contemplated by the Port of Seattle can be judicially recognized as a public rather than a private use. I daresay that all would agree that the term *public use* is not clearly and specifically defined in our state constitution; furthermore, that the term today, properly and recognizably, has a considerably dif-

ferent meaning in practice and application than it had fifty years ago. This is not to say that the term as used in the constitution had a well understood but limited and restrictive meaning at the time it became an integral part of our constitution. In *Stewart v. Great Northern R. Co.*, 65 Minn. 515, 68 N. W. 208, the court stated:

"The term 'public use' is flexible, and cannot be limited to the public use known at the time of the forming of the constitution. Any use of anything which will satisfy a reasonable public demand for public facilities for travel or for transmission of intelligence or commodities would be a public use. Mills, Em. Dom. § 21."

The very idea of taking private property for highways, schools, the development and transmission of electricity by both private and public entities, and for a number of other purposes which could be mentioned, may in some quarters a few years ago have seemed strange and surprising, but is recognized and accepted today as a proper function of government involving a public as contrasted to a private use. The Minnesota court, in *State ex rel. Twin City Bldg. & Inv. Co. v. Houghton,* 144 Minn. 1, 174 N. W. 885, 8 A. L. R. 585, stated:

"The notion of what is public use changes from time to time. Public use expands with the new needs created by the advance of civilization and the modern tendency of the people to crowd into large cities. Such a taking as here proposed could not possibly have been thought a taking for public use at the time of the adoption of our Constitution when the state was practically a wilderness without a single city worthy of the name. 'The term "public use" is flexible, and cannot be limited to the public use known at the time of the forming of the Constitution.' Stewart v. Great Northern Ry. Co., 65 Minn. 515, 68 N. W. 208, 33 L. R. A. 427. What constitutes a public use at the time it is sought to exercise the power of eminent domain is the test. The Constitution is as it was when adopted, but, when it employs terms which change in definition as conditions change, it refers to them in the sense in which they are meant when the protection of the Constitution is sought."

As noted above, amendment 9 to our constitution provides, in effect, for *de novo* judicial review of questions

of public use. However, this does not require mandatory, automatic, or arbitrary judicial veto of solemn determinations reached by the legislative branch of the state government. It certainly does not suggest simply a hasty substitution of personal judicial views and predilections for the deliberations, value-judgments and conclusions reached by the legislative branch.

Unless the situation is one where there can be little or no disagreement, the role of the judicial branch, although specifically made an independent one by amendment 9 of our state constitution, should be cautious and reticent. In the instant case it appears to me that there is reasonable, believable, and substantial ground for disagreement as to whether the use contemplated by the Port of Seattle—namely, the creation of industrial development districts—is a public one. As to this, I have in mind (a) statistics indicating a substantial and apparently continuing influx of people and population growth in the Seattle, Puget Sound area, (b) the imbalance and lack of diversification in the present economy occasioned by the present heavy emphasis upon aircraft and air missile defense production, and (c) the evaluations of this situation by qualified economists and others trained and experienced in related fields.

The majority have concluded that the creation and establishment of industrial development districts involves a private rather than a public use. I cannot agree. In this connection it appears to me that there is little point in referring to judicial decisions from other jurisdictions, since we are faced with economic facts and other data unique to this area, and with statutory and constitutional provisions, also essentially unique to our state. Nevertheless, I find considerable support for my views regarding this matter in the statement from *Gohld Realty Co. v. Hartford* (1954), 141 Conn. 135, 104 A. (2d) 365, reading as follows:

" 'In this State it is settled that public use means "public usefulness, utility or advantage, or what is productive of general benefit; so that any appropriating of private property by the State under its right of eminent domain for purposes of great advantage to the community, is a taking for

public use." *Olmstead v.·Camp*, 33 Conn. 532, 546; *Todd v. Austin*, 34 Conn. 78. . . . ' "

On the basis of the foregoing, I dissent.

MALLERY and HUNTER, JJ., concur with FINLEY, J.

August 14, 1959. Petition for rehearing denied.

